[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-11326
Non-Argument Calendar
_____

D.C. Docket No. 3:17-cr-00094-TJC-PDB-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHRISTOPHER LORAN BENTLEY,

Defendant-Appellant,

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(December 4, 2018)

Before TJOFLAT, MARTIN, and JORDAN, Circuit Judges.

Christopher Loran Bentley appeals his 10-year sentence for possession of a

firearm by a person convicted of a felony, possession of heroin with intent to

distribute, and possession of crack-cocaine with intent to distribute. After careful consideration, we affirm.

## I.

A grand jury indicted Bentley on three charges: possession of a firearm by a person convicted of a felony, in violation of 18 U.S.C. §§ 922(g) and 924(a)(2); as well as possession of heroin with intent to distribute and possession of crack-cocaine with intent to distribute, both in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C).

A change of plea hearing was held, where Bentley admitted the following facts. On April 22, 2017, police officers went to a residence in Jacksonville, Florida "in response to multiple citizen complaints that the residence was a haven for storage and usage of illicit drugs." The officers saw Bentley sitting in the driver's seat of a Toyota Tundra parked outside the house. One officer saw a bag of marijuana in plain view on the car's center console and asked Bentley for identification, which he provided. Bentley admitted the marijuana was his and handed it to the officer. The officer then asked Bentley to get out of the truck, and Bentley grabbed the steering wheel. A struggle ensued between Bentley and the officers, and Bentley attempted to start the truck. The officers, however, were able to remove Bentley from the truck and restrain him. While the officers escorted

him to a patrol car, Bentley spun to break free from one of the officer's grasp.  The officers regained control and placed him in the patrol car.

Upon returning to the truck, the officers saw a plastic bag on the ground that appeared to have fallen from the area of the driver-side door.  Inside the plastic bag were 1.8 grams of heroin and 1.1899 grams of crack-cocaine, both packaged for distribution.  The officers also saw a .45 caliber Taurus pistol wedged against the seatbelt buckle of the driver's seat.  The firearm was fully loaded, and it had been reported stolen.  At the time, Bentley had two prior convictions from April 8, 2010 which were punishable by over one year of imprisonment: possession with intent to sell, manufacture, or deliver a controlled substance and possession of a controlled substance.  Having admitted these facts, Mr. Bentley pled guilty to all three counts in the indictment.

At a status conference, the government told the district court and Bentley that it intended to call witnesses at sentencing to testify about Bentley's "uncharged criminal conduct."  The government said it would not disclose the witnesses' identities to Bentley because the witnesses feared Bentley and his family might retaliate.  Bentley objected to these witnesses and the government's refusal to disclose any information about their identities or their testimony.  The court ordered the government to provide discovery relating to these witnesses three days before sentencing.  The court also ordered the government to provide all other

undisclosed information it intended to use at sentencing within one week.  The record reflects that the government complied with these orders.

A Pre-Sentence Investigation Report (PSI) was prepared.  Relevant here, Mr. Bentley objected to ¶ 48 of the PSI.  Paragraph 48 stated Bentley "reported that he maintained a romantic relationship with" a woman named B.A.[1]  It described sworn testimony B.A. had given in 2016, in which she called Bentley her pimp and said she had fled from him in the past.  Paragraph 48 additionally noted Bentley had been arrested twice in 2014 for disputes between him and B.A.  And ¶ 48 said B.A. died from a cocaine and Fentanyl overdose and that Bentley was present and tried to help her.  Bentley objected to ¶ 48 "as irrelevant, salacious, and immaterial."

At sentencing, the district court calculated Mr. Bentley's guideline range as 51 to 63 months, based on a criminal history category of II and total offense level of 23.  The court also overruled Bentley's objection to ¶ 48 of the PSI.  The government informed the court that it intended to present two lay witnesses, C.G. and A.W., Special Agent Mark Latham of the Bureau of Alcohol, Tobacco, and Firearms, and victim impact testimony from B.A.'s parents.  C.G. would testify about her experiences as one of Bentley's sex workers and Bentley's relationship

---

[1] Certain witnesses' names were filed under seal in the district court.  Neither party has moved for these materials to be unsealed.  Therefore, we will refer to those witnesses in a manner consistent with the redactions in the sentencing transcript in the unsealed record.

with B.A.  A.W., a sex worker who associated with Bentley and was friends with B.A., would also testify about Bentley's relationship with B.A. and Bentley's behavior.  Agent Latham would testify about his investigation of Bentley.  Bentley objected to this testimony as irrelevant and unreliable.  The court overruled his objection, noting that "sentencing is different than trial" and that it was "inclined to allow a broader reach."

C.G. testified first.  C.G. met Bentley while doing sex work in Jacksonville, Florida.  She wanted Bentley to be her pimp because his reputation for being "ruthless" meant he could protect her from drug dealers and other pimps.  As her pimp, Bentley sold her at least $100 of crack and heroin each day.  He also physically harmed her on several occasions.  He threatened to break her teeth with the same firearm underlying the § 922(g) conviction, punched her in the face when she stood up for herself, and threatened to spank her with a metal pole to punish her alleged disobedience.

C.G. also testified about Bentley's relationship with B.A.  Before C.G. began working for Bentley, she would see B.A. and Bentley together often.  B.A., she said, worked for Bentley and, like her, got drugs from him.  While C.G. never saw Bentley beat B.A., she did see B.A. running from him, which led her to believe Bentley was physically abusive towards her.  And while C.G. never saw

Bentley shoot his gun, B.A. told her Bentley shot someone in the leg who was bothering B.A. about a debt she owed.

A.W. testified she was a former sex worker who met B.A. while working the same area as her. A.W. met Bentley through B.A. Like C.G. and B.A., she bought drugs—namely, crack-cocaine—from Bentley. Bentley once smacked A.W. across the face when she complained about him bringing an unwanted visitor to her house. While he never used a gun on her, A.W. once saw Bentley brandish and wave a small silver gun at one of B.A.'s clients who drove after her, B.A., and Bentley after B.A. ripped him off.

She described B.A. and Bentley's relationship as prostitute-pimp and girlfriend-boyfriend. This, A.W. said, was typical: the pimp convinces his worker that he loves her, and then "just end[s] up beating them up and sending them out on the street to make them money." That, A.W. testified, was the nature of B.A. and Bentley's relationship—Bentley "owned" her. A.W. witnessed Bentley get physical with B.A. She saw Bentley force B.A. into the covered flatbed of his truck and, on other occasions, slam B.A. against a wall. B.A. would frequently hide from Bentley at A.W.'s house, because "[s]he was always scared of him."

Agent Latham was the government's next witness. While Agent Latham was investigating sex trafficking in Jacksonville, he learned Bentley had a reputation as a violent pimp. Through Agent Latham, the government admitted

two Jacksonville Sheriff Office incident reports relating to disputes between B.A. and Bentley; photos B.A. sent to her mother; medical records from when Bentley broke his dominant hand; and a sheriff's report summarizing the investigation into B.A.'s death.

The first of the incident reports described Bentley dragging B.A. across the road, putting her in his car, and driving away with her. The second report described Bentley grabbing B.A. from behind and pulling her unwillingly out of a Burger King. The photos B.A. sent to her mother depict B.A. with a blackened bruise under her left eye. Agent Latham said B.A. told her mother that Bentley had given her a black eye because she stole drugs from him. Based on his discussions with C.G., Agent Latham testified that Bentley broke his dominant hand punching C.G. in the head, and Latham authenticated medical records showing Bentley had broken his left hand from punching someone.

The Sheriff's investigation into B.A.'s death revealed that B.A. died from a fentanyl and cocaine overdose. According to J.L., with whom Agent Latham spoke, B.A. likely stole the drugs that caused the overdose from Bentley while he was sleeping. When Bentley awoke, he found B.A. unresponsive and called J.L. J.L. called 911. J.L. and Bentley attempted CPR to no avail.

Finally, the government presented victim impact testimony from B.A.'s parents, both of whom blamed Bentley for B.A.'s death. Her mother called it "as

7

much a case of murder as if poison was laced in the cocaine instead of fentanyl," and her father said "Yes, I think he killed my daughter," imploring the court to "make something happen with this."

Bentley presented three witnesses: his cousin, Joseph Christopher George, his mother, Claudette Christopher, and his aunt, Debra Thomas. Mr. George said he witnessed a fistfight not involving C.G. during which Bentley seriously injured his dominant hand, and he believed Bentley had gotten medical treatment for it. Ms. Christopher, who raised Bentley as a single parent, testified she had never seen her son be violent or abuse B.A. She also noted she took B.A. in when B.A.'s parents wouldn't let her stay with them. And Ms. Thomas attested to Bentley's upstanding character, noting that she did not believe he abused B.A. based on her experience and did not believe that he was a drug dealer because he never seemed to have money. Bentley also proffered that he would have called another witness who was present to testify she never saw violence between B.A. and Bentley in 2013. Finally, Bentley allocuted, accepting responsibility for his actions, noting his desire to be a better role model for his three young daughters, and indicating one of his daughters had sickle-cell anemia and would have two incarcerated parents if the court sentenced him to imprisonment.

In argument, the government asked the court to consider the evidence it presented regarding Bentley's work as a pimp and his relationship with B.A. as

8

relevant to Bentley's "history and characteristics."  18 U.S.C. § 3553(a)(1).

Ultimately, the government argued for a sentence at "the top end of the guidelines

range."  Bentley asked for a below-guidelines sentence, asserting that the

testimony regarding his work as a pimp was unreliable, that the guidelines

overrepresented his criminal history, that this was simply a gun possession and

drug distribution offense, and that a shorter sentence would minimize the time his

sick daughter was without parental support.

Before sentencing Bentley, the court expressed its view of the evidence

presented and the parties' arguments.  The court explained that this was "a much

more serious offense" than a standard felon-in-possession and drug distribution

case, because "he had a gun at the ready, and he had drugs," and because he

struggled with officers during his arrest while the firearm was nearby.  The court

found credible the testimony that Bentley "always had the firearm with him,"

"fired [it] in anger," and "used it in various ways to threaten people, or to use it in

an aggressive way."

Evaluating Bentley's "history and characteristics" and "the nature and

circumstances of the offense," the court said the testimony it heard "put into

context, his possession of this firearm."  Acknowledging Bentley was not charged

with sex trafficking or distributing drugs to prostitutes, the court said the testimony

convinced it by a preponderance of the evidence that Bentley was a pimp who used

9

"coercion and violence, if necessary" to keep his workers "in tow." This, in the court's view, wasn't "too far afield from the gun charge, because there was evidence that Mr. Bentley used the gun in furtherance of his work as a pimp." While noting it did not believe Bentley intended B.A.'s death, the court said the evidence suggested her death was "a tragedy that was born . . . out of the scenario that [he] had created." The court ultimately found that, in general, the testimony presented at sentencing was "largely credible." And the court complimented Bentley's allocution, indicated it had no doubt that there was another side to Bentley, and said it was sympathetic to the loss his family would suffer were he incarcerated.

Nonetheless, the court said a "significant sentence . . . is appropriate" to "protect the public from [Bentley's] further crimes" and found that "Mr. Bentley does present a danger to the community." The court indicated the need to avoid unwarranted sentencing disparities, but suggested this was not an ordinary drug distribution and gun possession case in light of the evidence the government presented and the far more severe sentence Bentley would have faced had he been charged with sex trafficking offenses. The court also noted the need "to provide correctional treatment for Mr. Bentley" to effectuate a "complete reorganizing of the way that Mr. Bentley thinks about things," which would be facilitated by cognitive behavioral therapy provided by the Bureau of Prisons. Ultimately, the

10

court ruled "an upward variance [was] appropriate for the reasons [it had] stated" and sentenced Mr. Bentley to three concurrent 120-month terms of imprisonment on each of the three convictions.

The government did not object. Mr. Bentley objected to the sentence as procedurally and substantively unreasonable. When the court asked Mr. Bentley to clarify his procedural objection, Bentley renewed his objection that his criminal history computation overrepresented his true criminal record and expressed his belief that the court had upwardly departed, instead of upwardly varied, without the requisite notice.

This appeal followed.

## II.

On appeal, Mr. Bentley makes three primary arguments. First, he asserts the district court erred in admitting evidence of "uncharged conduct [that] had little reference to the charged conduct or offense(s) of the conviction," including testimony regarding Mr. Bentley's work and behavior as a pimp, his relationship with B.A., and B.A.'s death. Second, he asserts the district court erred in upwardly departing without providing requisite notice. And, finally, he asserts his sentence was substantively unreasonable. None of these arguments requires reversal.

## III.

We first address Mr. Bentley's claim of evidentiary error. We review a district court's evidentiary rulings for abuse of discretion. United States v. Perez-Oliveros, 479 F.3d 779, 783 (11th Cir. 2007). "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. "A sentencing court may consider any information, (including hearsay), regardless of its admissibility at trial, to determine whether factors exist that justify an enhancement of the defendant's sentence, provided that the evidence has sufficient indicia of reliability, the court makes findings of fact regarding credibility, and the defendant has an opportunity to challenge the evidence." United States v. Ghertler, 605 F.3d 1256, 1269 (11th Cir. 2010) (quotation marks omitted). "We have previously explained that sentencing courts may consider both uncharged and acquitted conduct in determining the appropriate sentence." United States v. Rushin, 844 F.3d 933, 942 (11th Cir. 2016) (quotation marks omitted).

The district court did not abuse its discretion in admitting evidence regarding Mr. Bentley's relationship with B.A. and his conduct as a pimp. The relevant statutory law is unambiguous, as is our Circuit's precedent. There is no indication the district court clearly erred in finding the government's witnesses credible.

12

There is likewise no indication that the district court clearly erred in ruling the government sufficiently proved Bentley was a pimp who used violence and coercion to conduct his business and that Bentley was, in some respects, responsible for B.A.'s death.   And the record reflects Bentley had the opportunity to challenge the government's evidence.

## IV.

Next, we address Bentley's claim that the district court made an improper upward departure.  We review de novo a district court's interpretation of a procedural rule.  United States v. McCullough, 851 F.3d 1194, 1199 (11th Cir. 2017).  Federal Rule of Criminal Procedure 32(h) requires a district court to give reasonable notice before it can depart from the applicable guideline range on a ground not identified in the PSI or in a party's pre-hearing submission.   However, this rule does not apply to variances.  See Irizarry v. United States, 553 U.S. 708, 714, 128 S. Ct. 2198, 2202 (2008).  A departure is a change to a sentencing guideline range based on certain specific departure provisions, while a variance is a sentence imposed outside the guideline range based on the court's consideration of the sentencing factors listed in 18 U.S.C. § 3553(a).  United States v. Hippolyte, 712 F.3d 535, 541 (11th Cir. 2013); see United States v. Kapordelis, 569 F.3d 1291, 1316 (11th Cir. 2009).  A district court need not give notice of an upward variance because "[s]entencing is a fluid and dynamic process and the court itself

13

may not know until the end whether a variance will be adopted, let alone on what grounds." Irizarry, 553 U.S. at 715, 128 S. Ct. at 2203 (quotation marks omitted). To determine whether the district court applied an upward departure or a variance, we consider whether the district court cited to a specific guideline departure provision and whether the court's rationale was based on the § 3553(a) factors and its finding that the guidelines were inadequate. See Kapordelis, 569 F.3d at 1316.

Here, district court did not upwardly depart, but upwardly varied. The court did not cite a specific guideline departure provision. Beyond that, the court expressly based its reasoning for Mr. Bentley's sentence on the § 3553(a) factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," and "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct [and] . . . to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(1), (2)(B)–(C). Because the district court's sentence was the product of a variance and not a departure, prior notice was not required.

## V.

Finally, we address Mr. Bentley's argument that his sentence was substantively unreasonable. We review the substantive reasonableness of a sentence for abuse of discretion. Gall v. United States, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007). "The party challenging the sentence bears the burden to show it

14

is unreasonable in light of the record and the § 3553(a) factors." United States v. Tome, 611 F.3d 1371, 1378 (11th Cir. 2010).

Mr. Bentley has not met his burden. No doubt, Bentley's 10-year sentence, nearly double the top of the guideline range, represents a major variance. See United States v. Irey, 612 F.3d 1160, 1196 (11th Cir. 2010) (en banc) (noting that variances of 33% or more from the top or bottom of the guideline range qualify as major). And such variances "require . . . more significant justification than . . . minor one[s]." Id.; United States v. Pugh, 515 F.3d 1179, 1200 (11th Cir. 2008). Indeed, "the justification [must] be 'sufficiently compelling to support the degree of the variance.'" Irey, 612 F.3d at 1196 (quoting Gall, 552 U.S. at 50, 128 S. Ct. at 597).

But if we "give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance," as we must, we cannot conclude Mr. Bentley's sentence was substantively unreasonable. Gall, 552 U.S. at 51, 128 S. Ct. at 597. The district court found that a major variance was warranted because Mr. Bentley presented a significant danger to the public, based on the evidence presented at sentencing and the underlying offense conduct. While we may have concluded a less severe sentence was appropriate, we cannot say that the district court's sentence "constitute[d] a clear error of judgment" in light of the evidence presented to the district court. Irey, 612 F.3d at 1187, 1189 (quotation

15

marks omitted).  Neither can we say the district court "fail[ed] to afford consideration to relevant factors that were due significant weight" or gave "significant weight to an improper or irrelevant factor."  Id. at 1189.

**AFFIRMED.**