[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-15622
_____

D.C. Docket No. 5:13-cr-00032-MTT-CHW-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DELTON RUSHIN,
RONALD LACH, JR.,
CHRISTOPHER HALL,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Georgia
_____

(December 21, 2016)

Before CARNES, Chief Judge, JORDAN, Circuit Judge, and LAMBERTH,[*] District Judge.

LAMBERTH, District Judge:

---

[*] Honorable Royce C. Lamberth, United States District Judge for the District of Columbia, sitting by designation.

Appellants were correctional officers at Macon State Prison (MSP) in Oglethorpe, Georgia. Specifically, they were members of the Correctional Emergency Response Team (CERT), which is a specially trained group responsible for responding to and controlling disturbances at MSP. In 2013, appellants were indicted and charged with various civil-rights, conspiracy, and obstruction-of-justice violations stemming from alleged abuses of prisoners and subsequent cover-ups. Appellants Delton Rushin and Christopher Hall were ultimately found guilty of one count of Conspiracy to Obstruct, 18 U.S.C. § 371, and two counts of Obstruction of Justice, 18 U.S.C. § 1519. Appellant Ronald Lach was convicted of Deprivation of Rights in violation of 18 U.S.C. § 242, Conspiracy to Obstruct in violation of 18 U.S.C. § 371, and Obstruction of Justice in violation of 18 U.S.C. § 1519. Rushin and Hall appeal on four grounds, (1) that the district judge should have recused himself from the case, (2) that a district court limitation on the cross-examination of cooperation witnesses violated defendants' sixth amendment rights, (3) that the district court improperly excluded evidence of prior inmate violence, and (4) that the district court sentenced them improperly. Lach appealed only on the grounds that the district court judge should have recused himself. This Court has jurisdiction under 28 U.S.C. § 1291.

2

## I.

Underlying this case are charges involving the beatings of several inmates at MSP. Specifically, the government alleged that appellants and others retaliated against certain inmates who hit officers. The CERT team would take the inmate to areas without cameras, often the gymnasium, and assault the still-handcuffed inmate. They would then take the inmate to the medical unit and lie about how the inmate's injuries were sustained. The CERT team would then write false witness statements that concealed the team's conduct while remaining consistent with one another. At trial the government presented four instances of this behavior.[1]

### 1. The Assault on Franklin Jones

In October 2010, inmate Franklin Jones assaulted an officer. The CERT team, including the appellants, responded to the incident. They escorted Jones to the gymnasium where, while he was still in handcuffs, they repeatedly beat him. Jones was brought to the medical unit where he was treated for injuries that included a laceration on the back of his head, swelling in the bones around both eyes, and blood in his mouth and nostrils. Jones did not have those injuries before the CERT team escorted him to the gymnasium.

---

[1] The background on the assaults provided below does not represent the full detail of what was alleged or argued at trial. The background details provided are to give context and color to the legal issues in this case. Further details on the assaults and falsified reports can be found in the parties' briefs and the trial transcripts.

The CERT team then wrote reports on what occurred and omitted mention of assaulting Jones. At trial, two CERT team officers testified that they were taught to "write their statements to coincide with each other" and to write a report to make it appear "like nothing happened." When Internal Affairs came to investigate, Hall told them to "just stick to what [they] had on the statement."

2. The Assault on Jabaris Miller

A few days after the assault on Jones, inmate Jabaris Miller attacked an officer. The CERT team again responded, handcuffed Miller, escorted him behind the "ID" building, and assaulted him. As with the attack on Jones, two CERT team officers testified that they were told "exactly what to write" on their reports.

3. The Assault on Mario Westbrook

In December 2010, inmate Mario Westbrook attacked a deputy warden. The CERT team responded and escorted Westbrook from the building. The team took Westbrook to the gymnasium where they assaulted him. Westbrook was subsequently taken to the medical unit where he had abrasions, a laceration, and two black eyes. Westbrook did not have those injuries before being escorted to the gymnasium.

Rushin's report on the incident does not discuss the assault and only states that he "assisted with escorting inmate Westbrook" from "unit E1 to medical."

4. The Assault on Terrance Dean

Shortly after the assault on Westbrook, inmate Terrance Dean assaulted an officer.  The CERT team again responded and Dean was escorted to the gymnasium.  Dean was told "this is what you get for hitting an officer" before the CERT team beat him.  Dean was beaten until he was unresponsive.  He was dragged to the medical unit, unable to walk or speak. He had a five-inch wide hematoma on his head, abrasions on his face and feet, a lacerated upper lip, his right eye was dilated and unresponsive to light, and the nurse believed it was possible he would die.  Dean was ultimately transported to a hospital.  When he later awoke he had severe neurological problems and ultimately had to spend six months in physical therapy to relearn how to walk.

The CERT team agreed to doctor their reports on the incident.  Each of their statements omitted any mention of the CERT officers using force against Dean. CERT officers testified against appellants.  One testified that Hall instructed him to look at other statements and "make [his] statement match theirs."  When one CERT officer went to meet with Internal Affairs investigators, Hall told him to "stick to what [he] wrote on the statement" and directed another to change his statements to make it consistent with other team member's statements.

5

II.

Less than three weeks before the trial began, appellants moved for the district court judge to recuse himself under 28 U.S.C. § 144 and 28 U.S.C. § 455. The basis for that motion was that the Judge had, while in private practice, litigated against the Georgia Department of Corrections. Additionally, during a pretrial hearing the Judge and counsel for defendants engaged in, as appellants describe it, a "spirited debate." Appellants maintain that the written transcript fails to convey the "tone of voice and emphasis, eye contact and body language" that they believe constituted and revealed bias against them. The Judge did not recuse himself. Additionally, the Judge stated that he would cut counsel's CJA voucher for time expended on the motion. Appellants now argue the judge should have recused himself and that he should not have cut counsel's CJA voucher.

Before oral argument, this Court addressed the issue of recusal in this case, affirming the district court. *United States v. Rushin et al.*, No. 14-15622, Doc. 85 (11th Cir. 2016). Defendant Lach had appealed only on the grounds that the judge should have recused himself. His appeal was fully resolved by that opinion, which found the judge did not err. The Court will not repeat the legal standards and analysis already articulated. They are equally applicable to Hall and Rushin's appeal on the issue of recusal given that the underlying facts are identical. For the

6

reasons and legal authorities stated in that opinion, we find that the judge did not abuse his discretion with respect to the motion to recuse.

One additional issue raised in this appeal is the judge's decision to limit defendant Hall's counsel's CJA voucher.  In general, "no appellate jurisdiction exists over an appeal of a district court's award of sanctions against counsel where the notice of appeal fails to make clear that counsel intends to participate as an appellant rather than as an appellant's attorney." *Bogle v. Orange Cty. Bd. of Cty. Comm'rs*, 162 F.3d 653, 660-61 (11th Cir. 1998).  However, if an award of fees is joint and several against counsel and the client, "it would be unjust to refuse to hear counsel's appeal." *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Associated Contractors, Inc.*, 877 F.2d 938, 939 n. 1 (11th Cir. 1989).

The notice of appeal fails to make clear that counsel intended to participate as an appellant.  Additionally, this is not a joint and several award of fees against a counsel and client.  Accordingly, this matter is not properly before the Court.

## III.

As noted above, multiple members of the CERT team cooperated with the government and testified at trial.  Those individuals had entered into plea agreements with the government, and defense counsel wished to cross-examine

7

them about their potential sentences had they not cooperated. For example, to elicit that a cooperating witness could have "cut a sweet deal for five years as opposed to 20." The government requested a limitation on defendants cross examining witnesses with regard to the specific numerical sentence that could have been imposed had they not cooperated, as this would speak to the potential sentences that could be received by the defendants and encourage jury nullification. The district court judge granted this motion, explaining that defendants were permitted to inquire into whether the cooperating witnesses entered into a plea agreement, if they faced a "more severe penalty" prior to cooperating, and if the witness received or expected to receive benefits in exchange for their testimony such as charges being dropped or consideration of a sentence reduction. However, defendants were not permitted to inquire as to the statutory sentence range for charges against cooperating defendants.

At trial, defendants told the judge what testimony they would have elicited but for his order. They explained this would include the statutory ranges for the crimes the witnesses were charged with, which defense counsel admitted would include all the crimes with which defendants were charged. Counsel then planned to elicit the statutory maximums and compare those to the plea agreements. They would then discuss mandatory minimums, 5K motions, the sentencing guidelines, and requests for downward departure. Counsel would do a "short bit of guidelines

calculations" with the witnesses to ultimately compare the plea and guidelines ranges.

Due to the Judge's order, defense counsel did not ask those questions. Nonetheless, counsel were able to and did in fact discuss the cooperating witnesses' plea agreements and the benefits of cooperating with the government. Counsel also were able to speak to the magnitude of the plea's impact for the cooperating witnesses. For example, one exchange between a witness and defense counsel included: "Q: Would you agree with me that that plea agreement is probably one of the most important documents you've ever signed in your life? A: Yes. Q: No question about it? A: No question about it." Appellants maintain that despite the questions they asked, they should have been permitted to make the broader inquiry they requested.[2]

The Court reviews limitations on the scope of cross-examination for "a clear abuse of discretion." *United States v. Maxwell*, 579 F.3d 1282, 1295 (11th Cir. 2009). However, we address *de novo* the question of whether a defendant's Sixth Amendment rights were violated. *United States v. Ignasiak*, 667 F.3d 1217, 1227 (11th Cir. 2012).

---

[2] At oral argument, appellants mentioned wishing to ask cooperating witnesses about a percentage reduction, e.g. "does cooperating mean you expect to get half the time? One quarter?" This sort of question does not appear in the section of the trial record where defense counsel articulated what they wished to ask and would have asked. We have limited our review to the issues raised before the district judge.

9

We have previously explained that there are two requirements with regard to a defendant's confrontation clause rights:

> First, the jury, through the cross-examination that is permitted, must be exposed to facts sufficient for it to draw inferences relating to the reliability of that witness. And second, the cross-examination conducted by defense counsel must enable him to make a record from which he could argue why the witness might have been biased.

*United States v. Van Dorn*, 925 F.2d 1331, 1335 (11th Cir. 1991). This is not unfettered however. There is "wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

We have not spoken on how limitations of the type in question here, prohibiting cross-examination on the potential sentences of cooperating witnesses, fits into the framework articulated in *Van Dorn* and *Maxwell*. However, other Circuits have done so. The First, Fourth, Seventh, Eighth, Ninth, and D.C. Circuits have all held that limitations like the one in question here are acceptable. *United States v. Luciano-Mosquera*, 63 F.3d 1142, 1153 (1st Cir. 1995), amended (Sept. 28, 1995) (holding the Sixth Amendment does not require the "precise number of years" a cooperating witness may face); *United States v. Cropp*, 127 F.3d 354, 358

10

(4th Cir. 1997) (affirming a limitation that defendant could ask whether a cooperating witness "faced a 'severe penalty' prior to cooperating, and whether they expected to receive a lesser sentence as a result of the cooperation" but could not ask "about the specific penalties at stake"); *United States v. Arocho*, 305 F.3d 627, 636 (7th Cir. 2002) ("[T]he district court's ruling restricting testimony about the specific sentencing guideline ranges and sentences did not impact the appellants' Sixth Amendment rights."); *United States v. Walley*, 567 F.3d 354, 360 (8th Cir. 2009) ("[W]e do not think that whatever marginal value might have been derived from presenting evidence that [a cooperating witness] faced a specific minimum sentence . . . is sufficient on this record to demonstrate that the court's ruling violated [defendant's] rights under the Confrontation Clause."); *United States v. Dadanian*, 818 F.2d 1443, 1449 (9th Cir.1987), *rev'd in part on other grounds on rehearing*, 856 F.2d 1391 (9th Cir.1988) ("Defense counsel was afforded more than an adequate opportunity to expose . . . potential bias and motive in testifying. The amount of jail time . . . faced is at best marginally relevant."); *United States v. Hall*, 613 F.3d 249, 256 (D.C. Cir. 2010) (affirming a restriction on evidence regarding "potential sentences faced[] or avoided . . . by pleading.").

The widespread view that district courts may limit cross examination into potential sentences is constrained.  For example, in *United States v. Larson* the

11

Ninth Circuit found a violation of defendant's rights when the district court's limitation prohibited questioning about a mandatory minimum life sentence. 495 F.3d 1094 (9th Cir. 2007). The Third Circuit "requires an examination of whether the magnitude of reduction would likely have changed the jury's mind regarding [a witness'] motive for testifying." *United States v. Mussare*, 405 F.3d 161, 170 (3d Cir. 2005); *see also United States v. Cooks*, 52 F.3d 101, 104 n. 13 (5th Cir. 1995) (finding error where the district court prohibited inquiry into a potential 99 and 40 year sentence.).

While the opinions of our sister circuits are not binding on us, the logic in many of these cases upholding limitations similar to the one at issue is persuasive. While it is imperative that a defendant be able to address the reliability and potential bias of a cooperating witness, in this case the precise number of years the cooperating witnesses may have faced provides little, if any, value above those questions defense counsel were permitted to ask.

Here, defendants could inquire as to whether cooperating witnesses otherwise faced a more severe penalty or expected to receive a lesser sentence. Moreover, one such witness, when asked about his plea agreement, identified it as "one of the most important documents" in his life. Moreover, defense counsel specifically argued that these reduced sentences created an incentive for the

cooperating witnesses to "twist the truth in a way that supports what the Government says transpired in this case."

Given that counsel could and did address the possibility that cooperating witnesses had motive to twist their story or lie, "[a]ny probative value of information about the precise number of years [a cooperator faced] . . . was slight." *Luciano-Mosquera*, 63 F.3d at 1153. An alternative holding would be problematic. Due to the fact that the sentence range applicable to these witnesses would reveal the sentence range for defendants, the proposed additional examination could invite jury nullification. The risk of jury nullification is accentuated by the fact that defendants were guards and the victims prisoners. We have previously explained that "[jury nullification] verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power." *United States v. Funches*, 135 F.3d 1405, 1409 (11th Cir. 1998) (quoting *United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983)). We have also held that district courts may constrain counsel from making arguments that encourage nullification, *United States v. Trujillo*, 714 F.2d 102, 105 (11th Cir. 1983), and do not find this case materially different. Moreover, not only would holding in defendants' favor limit the ability of district court judges to prevent prejudicial information from reaching the jury, but would likely lead to confusing and convoluted "mini-trials" on the issue of sentencing alone.

13

For example, defendant wished to inquire about the sentencing guidelines, do guidelines calculations, discuss downward departures, and much more. The sentencing guidelines can be complex and at points confusing, even to members of the judiciary who have regular exposure to them. Attempting to explain such a Byzantine system to jurors, who will most often lack prior knowledge of the guidelines, would almost certainly be both time consuming and confusing, even if defense counsel had no desire to make it so. *Arocho*, 305 F.3d at 636-37 ("[T]o the extent the appellants wanted to question [witnesses] as to the sentencing guideline provisions, that detailed inquiry could place in dispute many side issues, and could also confuse the jury as to the real issue at hand.").

This is not to say that the magnitude of a potential sentence could not ever shift this balance. However, this is not a case like *Larson* where discussion of a mandatory minimum life sentence was prohibited. Here, to the contrary, defendants were able to ask if the cooperators faced a "severe penalty" prior to cooperating, whether they expected to receive a lesser sentence as a result of their cooperation and whether the plea was one of the most important documents a cooperating witness had ever signed. Defense counsel were thus able to explore how the plea agreement could have impacted the witnesses' testimony, including the impact the witnesses expected it to have on their sentences, lives, and careers as well as the magnitude of that impact. Given the scope of the questioning that

14

was allowed in this case, the risk of jury nullification, and the complications associated with the questions defense counsel wished to ask, the district court's limitation on cross examination was not improper.

IV.

In addition to limiting cross examination regarding cooperation, the district court prohibited evidence regarding "poor working conditions, unrelated acts of violence, or other irrelevant conditions at [MSP]."  Defendants argued that such conditions were probative of (1) why a defendant may not recall an incident or recall it in a manner inconsistent with others and (2) to show witness bias and motivation given the duties of the CERT team.

In its order, the court explained that the government had argued that details of unrelated prison violence would encourage nullification.  Moreover, the court noted that defendants had not articulated a legitimate reason this information was relevant.  To the contrary, the court found that the defendants' logic implied that due to the harsh conditions at MSP defendants were justified in beating handcuffed prisoners they had brought to camera-free locations.  The court thus granted the government's motion while noting that defendants were free to raise the issue with the court again if they believed the information was relevant given the circumstances.  The court also noted that such information could indeed be

15

relevant if defendants were going to argue that they were confusing various incidents of altercations between inmates and guards when speaking with investigative officers.

During a bench conference that occurred during the opening statements, defendants raised this issue again.  At that point they argued that evidence of other instances wherein the CERT team responded to violence but did not assault the inmate would indicate that there was no conspiracy.  The government argued that they were charging a conspiracy to assault and cover up the four specifically charged instances, not all instances in which an inmate assaulted a guard.  The court maintained its prior ruling, instructing defense counsel they were free to argue there was no conspiracy but that they could not raise instances of unrelated inmate violence.

We review district court limitations on admission of evidence for abuse of discretion.  *United States v. Adair*, 951 F.2d 316, 320 (11th Cir. 1992).  However, as discussed above, we review constitutional challenges *de novo*.  *United States v. Underwood*, 446 F.3d 1340, 1345 (11th Cir. 2006).  We have explained that "it is axiomatic that a defendant's right to present a full defense does not entitle him to place before the jury irrelevant or otherwise inadmissible evidence." *United States v. Ruggiero*, 791 F.3d 1281, 1290 (11th Cir.) (quoting *United States v. Anderson*, 872 F.2d 1508, 1519 (11th Cir. 1989)).  The Supreme Court has also stated that

16

evidence can be excluded "if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006). That said, "[a] criminal defendant's right to present witnesses in his own defense during a criminal trial lies at the core of the fifth and fourteenth amendment guarantees of due process," *United States v. Ramos*, 933 F.2d 968, 974 (11th Cir. 1991), and "[a] defendant's right to a fair trial is violated when the evidence excluded is material in the sense of a crucial, critical, highly significant factor," *id*.

In this case defendants were charged with assaulting four inmates and covering up those assaults. In determining if the district court's exclusion of evidence was proper, we look to its probative value and any factors, such as confusion of issues or misleading the jury, that weigh against that probative value. *Holmes*, 547 U.S. at 326. The evidence the district judge excluded had little, if any, probative value or significance. Specifically, the judge ordered that while evidence of unrelated acts of violence or conditions—which no one argues made the assaults in question more or less likely or more or less justified—could not generally be introduced, there were instances in which they could be introduced.

Indeed, in a footnote, the judge articulated that acts of unrelated violence may be relevant to arguments that defendants did not lie, but rather were confused as to what violent altercation was being discussed. If defendants wished to pursue

17

this line of argumentation, the judge explained "such evidence of seemingly unrelated incidents could be relevant to the defense."  There is no indication appellants pursued this line of argumentation.  Similarly, though defendants mentioned the possibility of witnesses having had prior negative interactions with the CERT team that could color their testimony, there is no indication any such instances were raised to the judge despite the judge ordering that "the Defendant shall advise the Court outside the presence of the jury" if circumstances arise in which seemingly unrelated acts of violence could be relevant.

The argument proffered during the bench conference, that the absence of other retaliatory beatings undermines the claims of conspiracy for these retaliatory beatings, does not sufficiently articulate the evidence's probative value.  As the government noted, it is akin to arguing that someone did not rob a bank because there remained other, unrobbed banks.  Simply put, the existence of unbeaten inmates says nothing about who beat Franklin Jones, Jabaris Miller, Mario Westbrook, and Terrance Dean.[3]

As noted by the judge, defendants' basis for admitting evidence of unrelated acts of violence or prison conditions appeared to be jury nullification.  The district

---

[3] Appellants argue before this Court that the absence of prior assaults could show these assaults were carried out by junior members who subsequently claimed appellants encouraged them. This argument does not appear to have been made at trial or before the district judge.  Accordingly, that argument is waived. *OSI, Inc. v. United States*, 285 F.3d 947 (11th Cir. 2002).

18

court operated well within the bounds of established precedent by holding that was not a sufficient basis to admit otherwise irrelevant information. *United States v. Funches*, 135 F.3d 1405, 1409 (11th Cir. 1998) ("[T]he potential for nullification is no basis for admitting otherwise irrelevant evidence.").

## V.

Defendants Hall and Rushin were found guilty of Obstruction and Conspiracy to Obstruct charges but were found not guilty of the substantive civil rights related charges against them. They maintain that they were sentenced based on the conduct for which they were acquitted and that as a result, the length of their sentence quadrupled. The government maintains that sentencing for obstruction charges is necessarily linked to the nature of the underlying obstructed offense. Moreover, they maintain that Circuit precedent forecloses appellants' arguments.

We have previously explained that "sentencing courts may consider both uncharged and acquitted conduct in determining the appropriate sentence." *United States v. Hasson*, 333 F.3d 1264, 1279 n. 19 (11th Cir. 2003); *see also U.S. v. Smith*, 741 F.3d 1211 (11th Cir. 2013). Moreover, "[o]ne panel of this Circuit cannot overrule another panel's decision." *Julius v. Johnson*, 755 F.2d 1403, 1404 (11th Cir. 1985). Accordingly, we do not find error with the district court's sentencing.

19

VI.

On each of the grounds of appellants' appeal, we find no error on the part of the district judge. The record of this case reveals that defendants had adequate ability to make their arguments to the jury and that the minimal restrictions put in place regarding cross examination and admission of evidence were reasonable in light of the arguments made to the district judge. The judgment entered below is AFFIRMED for the reasons stated in this Court's opinion previously docketed in this case and herein.

**AFFIRMED**

JORDAN, Circuit Judge, concurring:

I concur in the Court's opinion with the understanding that our holding in Part III is a narrow one which does not set out any bright-line rules, and which is limited by the facts of this case, including the proffer made by defense counsel about the wide-ranging questions they wished to ask (such as questions about the application of the advisory Sentencing Guidelines).

The amount of prison time a government witness is hoping (or expecting) to avoid by cooperating can be very relevant to his motivation to do (and say) what pleases the government. The human condition strongly suggests that a person may not be willing (or likely) to lie under oath if he expects his benefit to be 8 years in prison rather than 9, but his incentive to dissemble and falsify may increase exponentially if he expects to serve a couple of years in prison instead of a couple of decades. *See, e.g.*, Miriam Hechler Baer, *Cooperation's Cost*, 88 Wash. U.L. Rev. 903, 936 (2011) (noting the motivation to lie where "a potentially massive reduction in sentence is at stake."). In an appropriate case, therefore, it may be necessary to allow defense counsel to ask a cooperating witness how much of a break he expects to get (or has already received) in exchange for testifying for the government. *See Brown v. Powell*, 975 F.2d 1, 6 (1st Cir. 1992) (Pollack, D.J., dissenting). And that may, in turn, require questions about statutory penalties, notwithstanding possible concerns about jury nullification. Because we "generally

presume that jurors follow their instructions," *Penry v. Johnson*, 532 U.S. 782, 799 (2001), we should not lightly assume that mere knowledge of available statutory penalties will transform a jury from a deliberative group into a lawless body.

Assume, for example, that in a federal narcotics case a cooperating witness is indicted on drug trafficking charges and faces a mandatory minimum sentence of 20 years in prison due to (a) the amount of cocaine involved and (b) his prior felony drug conviction. *See* 21 U.S.C. § 841(b)(1)(A). But he agrees to cooperate, provides the government with historical information, and testifies at trial against his co-defendants. In exchange, the government agrees to dismiss the indictment against him, and files a superseding information with a single count of using a communications facility to commit a drug trafficking offense. *See* 21 U.S.C. § 843(b). That charge, given the witness' prior felony drug conviction, is punishable by no more than 8 years in prison. *See* 21 U.S.C. § 843(d)(1). So, by the time the witness testifies, he has already received (no matter what happens to him at his sentencing) the benefit of shaving off 12 years in prison simply because of the government's charging decisions. In that circumstance, there would be a strong Sixth Amendment claim that defense counsel should be able to ask about the mandatory minimum sentence the witness faced under the initial indictment and the maximum (and substantially lower) sentence he is now facing under the superseding information. *See United States v. Larson*, 495 F.3d 1094, 1104 (9th

22

Cir. 2007) (en banc) ("Because the jury was sufficiently apprised of Poitra's incentive to testify to the Government's satisfaction—including the [five-year] mandatory minimum sentence Poitra faced in the absence of cooperation with the Government—there was no Sixth Amendment error."); *United States v. Massare*, 405 F.3d 161, 170 (3d Cir. 2005) (requiring "an examination of whether the magnitude of reduction would likely have changed the jury's mind regarding [a witness'] motive for testifying"); *United States v. Cooks*, 52 F.3d 101, 103–04 & n.13 (5th Cir. 1995) (holding that it was error for district court to preclude questioning of cooperating witness as to the 99- and 40-year sentences he faced for charges in Texas and Louisiana).

The Court's opinion, which cites these cases, does not foreclose such a Sixth Amendment claim.  I therefore join it in full.