[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-10709

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ROSE BETH LITZKY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:18-cr-00223-RBD-EJK-2

_____

Before JORDAN, NEWSOM, and ED CARNES, Circuit Judges.

NEWSOM, Circuit Judge:

Rose Beth Litzky and Roberto Oquendo had two young daughters. Oquendo is a pedophile. And while he was away from home, Litzky sent him hundreds of nude images and videos of the girls—both of whom were under the age of five. Litzky was ultimately convicted of possessing child pornography, producing it, and conspiring to do the same.

Litzky's appeal raises two claims of error. First, she argues that the district court violated her constitutional right to present a defense by excluding expert testimony related to her intellectual disability. Second, she insists that her below-Guidelines sentence was substantively unreasonable. Because neither claim has merit, we affirm.

I

A

When Roberto Oquendo was pulled over for a traffic stop in Melbourne, Florida, two of his passengers told police that he had child pornography on his phone. The police interviewed Oquendo, and he admitted to taking "pictures of the genital area of his daughters for his sexual gratification" while living with their mother, Rose Beth Litzky. Upon further investigation, law-enforcement officers discovered thousands of lewd images of naked children on Oquendo's electronic devices. Among those images were screenshots of video conversations between Oquendo and

Litzky from numerous dates over several months, where Litzky was posing the two child victims, focusing on their vaginas. The investigation then turned to Litzky.

She was interviewed by two federal agents—Aja Stake and Michael Spadafora. Though Litzky initially denied responsibility, she later admitted that she had produced graphic pictures of her daughters for Oquendo while he was away in Virginia for several months. The agents found more naked photos of the children stored on Litzky's phone.

Eventually, Litzky confessed to sending approximately 500 nude images and videos of her two children to Oquendo for his sexual gratification. Ordinarily, we would spare you the graphic details, but, as it turns out, they're relevant to the sentencing issue we have to decide. So, here they are: The photos that Litzky took were focused on the girls' vaginal and buttocks areas, and she confessed that she sometimes spread the vagina of her daughters apart when taking the pictures. When she would tell one of the girls to "open her legs" to take a picture for Oquendo, the girl would ask, "For daddy?" When Litzky would say yes, the young girl would respond by saying, "Oh, I know what daddy likes," and then place her fingers on her vagina. In addition, during video calls, Litzky would pose the girls for Oquendo by spreading their legs or vaginal labia, or instruct them to fondle themselves before the camera. Litzky believed that all of this began when her elder daughter was only two years old and her younger daughter was just born.

Oquendo identified Litzky as a "willing participant" in the sexual abuse.  In fact, Litzky would sometimes "initiate sending Oquendo nude pictures" or "lure Oquendo back to the house or ask for money by sending nude or posed pictures of the girls to him."  On at least one occasion, she told Oquendo to "[g]o play"— meaning masturbate—after he saw the girls naked.  Importantly here, Litzky confessed that she knew all of this was wrong, but that she did it to please her pedophilic paramour.

## B

Prior to an indictment being filed, Litzky's attorney referred her to Dr. Valerie McClain for what the latter described as a "psychological evaluation to assess [Litzky's] competency to proceed and address mitigating factors for sentencing."  During the visit, Dr. McClain learned that Litzky had a history of physical abuse by her parents and was gang raped at the age of 13.  Litzky was also in the "mildly intellectually deficient range."  And she told Dr. McClain that Oquendo was abusive.  Dr. McClain concluded that Litzky's "intellectual disability coupled with her history of victimization placed her in a position of extreme vulnerability without the necessary protective support to protect herself and her children."

Litzky was later indicted for various child-pornography offenses.  *See* 18 U.S.C. §§ 2251(a), (e), 2252A(b)(2).  Before trial, the government moved to prevent Dr. McClain from testifying.  At an evidentiary hearing on the matter, Dr. McClain confirmed that she still believed Litzky had a "mild[] intellectual[] disab[ility]" and "PTSD."    When   asked   whether   "people   with   intellectual

disability . . . have the wherewithal to form intent," Dr. McClain responded that "they are capable depending upon the person." But she didn't specify whether she thought Litzky—or even someone with a similarly "mild" disability—could form the specific intent to produce child pornography. Even so, Dr. McClain admitted that the evidence showed that Litzky had the "behavioral capacity" to spread her daughter's legs "for the purpose of taking a picture" and that Litzky knew how to use her phone to take and transmit photographs. Rather than offering evidence to negate Litzky's intent, then, Dr. McClain merely testified that, "based upon a reasonable degree of psychological certainty," Litzky "would not have taken the pictures" if Oquendo hadn't requested them.

Following the hearing, the district court granted the government's motion to exclude Dr. McClain's testimony. In short, the court said that "the problem [with] Dr. McClain's proffered opinions" is that they "do not focus on [Litzky]'s specific state of mind at the time of the charged offenses." Doc. 102 at 9. Because the testimony "fail[ed] to show how [Litzky] was unable to form the required *mens rea*"—and the evidence lacked "an adequate foundation" to boot—the district court concluded that the testimony would only serve to "confuse" the jury. *Id.* at 10–11.

Litzky proceeded to trial without Dr. McClain's testimony, and the jury found her guilty as charged.

## C

After trial, the district court determined that Litzky's total offense level was 43 and that with a criminal history category of I, her advisory Guidelines sentence was 960 months (80 years).[1]  The children's adoptive mother then offered a victim-impact statement, characterizing Litzky as a "true monster" who "used these girls as [her] personal pawns to get money and things [she] wanted."  According to the adoptive mother, the children were "uncontrollable due to [the] sexual abuse, trauma, and loss."  Both would hit themselves, cry hysterically for hours, and projectile vomit as a result of "overwhelming fear."  One of the daughters "literally equated sexual abuse with love."  She "routinely pose[d] provocatively wanting her picture taken" and would "touch herself and others inappropriately."  Beyond that, she "would lay down on the bed and spread her legs open and brace herself waiting for someone to victimize her" at bedtime.

Despite these harrowing facts, the district court decided to vary downward—and significantly so.  It thought that the Guidelines' recommended sentence would be "excessive," particularly in view of Litzky's difficult childhood and her intellectual disability.  Doc. 228 at 12, 14, 16.  But, focusing on the § 3553(a) factors, the

[1] Litzky's total offense level was actually 53, but the district court capped it at 43 pursuant to Application Note 2 to the Sentencing Guidelines Table.  Although the Guidelines "range" for this offense level would normally be life, it was reduced to 80 years to account for various statutory maximums.  *See* U.S.S.G. § 5G1.2 & App. Note 3(B); 18 U.S.C. §§ 2251(e), 2252A(b)(2).

court also found that Litzky's requested sentence of 15 years would be "insufficient to achieve the statutory purposes of sentencing." *Id.* at 16–17. As the court explained, "the complicity of a mother in the sexual abuse of her own children to satisfy the perverted sexual lust of her paramour deserves a special place in the bowel of human depravity." *Id.* at 14. And even after she was found guilty, Litzky didn't "express contrition or remorse." *Id.* at 17. Thus, the district court determined that a 30-year sentence—followed by a life term of supervised release—was appropriate.

Litzky timely appealed, raising one challenge to her conviction and one to her sentence.

## II

We begin with Litzky's challenge to her conviction. She contends that the district court's exclusion of Dr. McClain's testimony gutted her preferred theory of defense and thereby violated her constitutional rights.[2] Because Dr. McClain's proffered testimony wasn't keyed to any *legally acceptable* defense theory, we reject Litzky's argument.

## A

The Constitution "guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v.*

---

[2] "Whether the exclusion of evidence violated a constitutional guarantee is a legal question reviewed *de novo.*" *United States v. Sarras,* 575 F.3d 1191, 1209 n.24 (11th Cir. 2009).

*Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).  But that right isn't absolute.  *See Michigan v. Lucas*, 500 U.S. 145, 149 (1991).  "[F]ederal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."  *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *see Taylor v. Illinois*, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.").  And "[s]uch rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"  *Scheffer*, 523 U.S. at 308 (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)).  Put simply, "the right to introduce relevant evidence can be curtailed if there is a good reason for doing that."  *Clark v. Arizona*, 548 U.S. 735, 770 (2006).

"A policy"—like that embodied in Federal Rule of Evidence 702—"which aims at preventing the use of unreliable or misleading expert evidence in criminal trials is far from arbitrary."  *United States v. Frazier*, 387 F.3d 1244, 1272 (11th Cir. 2004) (en banc).  And Litzky doesn't dispute that Dr. McClain's testimony was inadmissible under Rule 702.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–97 (1993) (describing how courts should apply Rule 702 to exclude unreliable or unhelpful expert testimony).  Accordingly, to show that she "was deprived of [her] constitutional right to present a defense, [Litzky] must demonstrate a compelling

reason for making an exception to the expert witness rules in this case." *United States v. Gillis*, 938 F.3d 1181, 1195 (11th Cir. 2019).

## B

She has not done so—principally because Dr. McClain's testimony wasn't geared to any issue that the jury was tasked with deciding. Under the Insanity Defense Reform Act (IDRA), it is an affirmative defense to a criminal charge "that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of [her] acts." 18 U.S.C. § 17(a). But that's it: A "[m]ental disease or defect does not otherwise constitute a defense." *Id.* We have thus interpreted the IDRA "to prohibit the presentation of evidence of mental disease or defect, short of insanity, to excuse conduct." *United States v. Westcott*, 83 F.3d 1354, 1358 (11th Cir. 1996). And Litzky has expressly disavowed any claim that she fits within the IDRA's circumscribed definition of insanity. She has also admitted—first in her interview with federal agents, and again at trial—that she knew what she was doing was wrong.

Despite the IDRA's limitations, the law "does not, by its terms, prohibit psychiatric evidence relevant to issues other than excuse or justification of otherwise criminal conduct." *Id.* Accordingly, we've held that "psychiatric evidence is still admissible where it negates the *mens rea* of a specific intent crime." *United States v. Bates*, 960 F.3d 1278, 1288 (11th Cir. 2020). Litzky claims that Dr. McClain's expert testimony—though otherwise inadmissible—

falls into this latter category. But even assuming that the production of child pornography is a specific-intent crime, Litzky's argument still falls short.

That's because she "has failed to demonstrate how her psychiatric evidence would negate intent and not merely present a dangerously confusing theory of defense more akin to justification and excuse than a 'legally acceptable theory of lack of *mens rea*.'" *United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990) (quoting *United States v. Pohlot*, 827 F.2d 889, 906 (3d Cir. 1987)). To reiterate, Dr. McClain opined that Litzky's "intellectual disability coupled with her history of victimization placed her in a position of extreme *vulnerability*." Doc. 115-9 at 4 (emphasis added). But vulnerability connected to intellectual disability isn't a basis for acquittal. *See* 18 U.S.C. § 17(a); *Bates*, 960 F.3d at 1290. Instead, "Congress chose to eliminate any form of legal excuse based upon psychological impairment that does not come within the carefully tailored definition of insanity in section 17(a)." *Cameron*, 907 F.2d at 1061. To aid the jury, then, Dr. McClain "would have to provide the 'link' between [Litzky]'s condition and the likelihood that, at the time of the offense," she didn't form the intent to produce or otherwise agree to produce child pornography. *Bates*, 960 F.3d at 1290. Dr. McClain didn't do so. Her report's lack of "focus[] on [Litzky]'s state of mind at the time of the allegedly criminal incidents" therefore dooms Litzky's constitutional claim. *Westcott*, 83 F.3d at 1358; *see Bates*, 960 F.3d at 1290.

In response, Litzky suggests that her desire to please Oquendo negates her *mens rea*. That's incorrect. The *mens rea* element "is generally satisfied . . . by any showing of purposeful activity, regardless of its psychological origins." *Pohlot*, 827 F.2d at 904; *see Westcott*, 83 F.3d at 1358. So Litzky's motive to produce child pornography—whether the product of her mental condition or not—is beside the point. Dr. McClain's opinion might suggest impaired volitional control on Litzky's part. But where, as here, "the defendant claims to have psychiatric evidence relevant to 'an incapacity to reflect or control the behaviors that produced the criminal conduct, such evidence is not "psychiatric evidence to negate specific intent" and should not be admitted.'" *Bates*, 960 F.3d at 1288–89 (alterations adopted) (quoting *Cameron*, 907 F.2d at 1066).

Furthermore, even if Dr. McClain's testimony were relevant and "critical to [Litzky's] defense," Litzky hasn't shown that the evidence "bore persuasive assurances of trustworthiness." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *see Pittman v. Sec'y, Fla. Dep't of Corr.*, 871 F.3d 1231, 1248 (11th Cir. 2017) ("Pittman would only be entitled to a constitutional override of Florida's rules if Pittman had offered evidence that the Hodges' hearsay statement was sufficiently trustworthy and reliable."); *see also Scheffer*, 523 U.S. at 312 (holding that the blanket exclusion of polygraph evidence didn't violate the right to present a defense, as the law was "a rational and proportional means of advancing the legitimate interest in barring unreliable evidence"). Rule 702 "requires that trial

courts act as 'gatekeepers' to ensure that speculative, unreliable expert testimony does not reach the jury." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (citing *Daubert*, 509 U.S. at 589 n.7, 597). And here, the district court found that Dr. McClain didn't have an "adequate foundation" to testify regarding Litzky's ability to form the intent necessary to commit the charged crimes. Doc. 102 at 11. The court also determined that admitting the testimony wouldn't "'assist the trier of fact'" and would instead lead to "speculat[ive]" and "foundationless inference drawing." *Id.* (quoting Fed. R. Evid. 702); *see Frazier*, 387 F.3d at 1272 ("[T]he trial judge's role as gatekeeper is designed to ensure that the jury, in carrying out its prescribed role, bases its determinations on relevant and reliable evidence, rather than on speculation or otherwise unreliable conjecture."). Although Litzky acknowledges these points, she doesn't challenge them. And that's a problem. As we have held en banc, "a court may constitutionally enforce evidentiary rules to limit the evidence an accused . . . may present in order to ensure that only reliable opinion evidence is admitted at trial." *Frazier*, 387 F.3d at 1272; *see Gillis*, 938 F.3d at 1195; *United States v. Rushin*, 844 F.3d 933, 941 (11th Cir. 2016); *cf. Clark*, 548 U.S. at 778 (noting the "real risk that an expert's judgment in giving capacity evidence will come with an apparent authority that psychologists and psychiatrists do not claim to have").[3]

---

[3] Litzky stresses that, even if Dr. McClain's methodology wasn't sound and she lacked an adequate foundation, she was still well qualified as an expert. But that presents *more*—not less—cause for concern. "There is often an inherent

Litzky next turns to Dr. McClain's testimony at the evidentiary hearing. But that testimony—that Litzky wouldn't have produced the pornographic content absent Oquendo's requests—suffers from the same basic defect. Namely, it doesn't speak to the legally salient issue. *See United States v. Ruggiero*, 791 F.3d 1281, 1290 (11th Cir. 2015) (holding that the Constitution "does not require that the jury be allowed to hear evidence that is not relevant to any element of the crime or an affirmative defense"). As already explained, whether Litzky knew what she was doing when she produced the pornographic images of her children—not whether, as a general matter, she had mental health issues or was vulnerable to manipulation—was the relevant question. *See Cameron*, 907 F.2d at 1061, 1067. And because Dr. McClain's opinion "does not bear" on this question, *Bates*, 960 F.3d at 1290, there is no "massive need for the excluded testimony" that might support a constitutional exception to the rules of evidence, *Knight v. Dugger*, 863 F.2d 705, 729 (11th Cir. 1988).

To be sure, Litzky's preferred defense strategy might have been to deflect blame onto Oquendo and play on the jury's sympathies. But the mere fact that Dr. McClain's testimony "would have

---

danger with expert testimony unduly biasing the jury because of its aura of special reliability and trust." *United States v. Boney*, 977 F.2d 624, 631 (D.C. Cir. 1992) (quotation marks omitted); *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). And that risk is only exacerbated when an expert holds impressive qualifications and nevertheless introduces foundationless or unreliable testimony. *See Frazier*, 387 F.3d at 1261.

been helpful to [Litzky]'s defense does not provide a compelling reason for admitting that testimony despite its failure to satisfy *Daubert* and the rules of evidence." *Gillis*, 938 F.3d at 1195. Indeed, the district court expressed legitimate concerns about the likelihood that Dr. McClain's testimony would only confuse the jury and distract from the relevant issues. *See Cameron*, 907 F.2d at 1067 (explaining that psychiatric evidence "presents an inherent danger that it will distract the jury[] from focusing on the actual presence or absence of *mens rea*"). And that further supports the constitutionality of the district court's exclusion. "As the Supreme Court [has] explained, 'the Constitution leaves to the judges who must make these admissibility decisions wide latitude to exclude evidence that poses an undue risk of confusion of the issues.'" *United States v. Mitrovic*, 890 F.3d 1217, 1226 (11th Cir. 2018) (alterations adopted) (quoting *Crane*, 476 U.S. at 689–90); *see also Holmes v. South Carolina*, 547 U.S. 319, 326–27 (2006); *United States v. Machado*, 886 F.3d 1070, 1086 (11th Cir. 2018).

In fact, the Court in *Clark v. Arizona* specifically observed that "allowing mental-disease evidence on *mens rea* can . . . easily mislead" a jury. 548 U.S. at 776. And because of that risk, the Court held that it was constitutionally permissible for Arizona "to avoid confusion and misunderstanding on the part of jurors" by "confining consideration of this kind of evidence to insanity." *Id.* at 776, 779. That is, the *categorical* exclusion of expert opinion evidence "from consideration on the element of *mens rea*" didn't violate the accused's right to present a defense. *Id.* at 764, 779. This case

presents the same legitimate concerns. *See Cameron*, 907 F.2d at 1067. And it demands the same conclusion: Litzky's right to present a defense was not violated.

Finally, Litzky complains that the prosecutor asked Agent Stake whether she observed any autism disorder or intellectual disability during her interviews with Litzky. This, Litzky says, put Litzky's disability "directly at play" and required the admission of Dr. McClain's testimony. Br. of Appellant at 40. We disagree. For one thing, Litzky opened the door to this line of questioning. It was done by the prosecutor on redirect and in response to defense counsel's effort to probe Agent Stake's experience with individuals with intellectual disabilities—specifically autism—and the police department's related policies in questioning such persons. Moreover, Dr. McClain's testimony "was not necessary to correct any misleading impressions that may have been created by" Agent Stake's comments. *United States v. Hurn*, 368 F.3d 1359, 1367 (11th Cir. 2004). The prosecutor expressly acknowledged that Agent Stake wasn't an expert. Her lay testimony offered little more than what the jury would have been able to discern for itself in hearing recordings of Litzky's prior interviews and her live trial testimony. And again, Dr. McClain's proffered testimony just wasn't "highly significant to a material element of the case." *United States v. Funches*, 135 F.3d 1405, 1408 (11th Cir. 1998). It would have served only to explain Litzky's actions, not to negate the intent

behind those actions. *See Cameron*, 907 F.2d at 1067.[4] While this evidence of intellectual disability might have provided a reason for sentence mitigation, *see Penry v. Lynaugh*, 492 U.S. 302, 328 (1989), it wouldn't have given the jury "a reason in law not to convict," *Hurn*, 368 F.3d at 1367 (quoting *Funches*, 135 F.3d at 1408).

★  ★  ★

In sum, because Litzky hasn't demonstrated that her constitutional rights were violated by the exclusion of Dr. McClain's testimony, we affirm her conviction.

---

[4] Litzky seemed to take a somewhat different tack in her reply brief. There, she suggested as a fallback that the district court should at least have admitted Dr. McClain's testimony to provide context for the jury as to the weight to be afforded to Litzky's inculpatory statements to police. This belated theory is forfeited. *See United States v. Lopez*, 649 F.3d 1222, 1246 (11th Cir. 2011). But even if not, it fails on the merits. The district court rightly noted that "Dr. McClain's report and testimony provide no opinion on the interviews by police in this case or any information as to why [Litzky]'s specific intellectual disability or other mental health issues would make her more susceptible to providing a false confession." Doc. 102 at 13. Because "Dr. McClain's opinions would not be particularly probative of the weight properly afforded to [Litzky]'s admissions and would instead be highly prejudicial," the district court excluded them. *Id.* Litzky doesn't challenge that application of Federal Rule of Evidence 403 on appeal. And she offers no authority suggesting that the district court's proper application of Rule 403 was constitutionally infirm. *See Clark*, 548 U.S. at 770; *Holmes*, 547 U.S. at 326; *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (plurality op.) (stating that Rule 403 and similar evidentiary rules are "unquestionably constitutional"); *Rushin*, 844 F.3d at 941.

## III

Now to the alleged sentencing error. Litzky submits that even though her 30-year sentence was 600 months below the Guidelines' recommendation, it was substantively unreasonable. This claim, too, is meritless.

We review the reasonableness of a district court's sentence for an abuse of discretion. *Gall v. United States*, 552 U.S. 38, 41 (2007). Under this deferential standard, we "may vacate the sentence only if we 'are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the [18 U.S.C.] § 3553(a) factors' by imposing a sentence that falls outside the range of reasonableness as dictated by the facts of the case." *United States v. Taylor*, 997 F.3d 1348, 1355 (11th Cir. 2021) (per curiam) (quoting *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc)). As the challenger, Litzky "has the burden of showing that the sentence is unreasonable in light of the entire record, the § 3553(a) factors, and the substantial deference afforded sentencing courts." *United States v. Rosales-Bruno*, 789 F.3d 1249, 1256 (11th Cir. 2015). And that burden is particularly onerous where, as in this case, the district court has imposed a sentence significantly below that recommended by the Guidelines. *See United States v. Cubero*, 754 F.3d 888, 898 (11th Cir. 2014).

Litzky has not carried that heavy burden here. In a 17-page opinion, the district court thoroughly and thoughtfully explained why it believed a downward variance of 50 years—but no more—

met the goals of sentencing.  That determination was well within the bounds of reasoned discretion.

Start with the seriousness of Litzky's offense and the need to provide just punishment.  *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A).  This court has repeatedly recognized that "[c]hild sex crimes are among the most egregious and despicable of societal and criminal offenses."  *United States v. Sarras*, 575 F.3d 1191, 1220 (11th Cir. 2009); *accord United States v. Hall*, 965 F.3d 1281, 1299 (11th Cir. 2020); *United States v. Kirby*, 938 F.3d 1254, 1259 (11th Cir. 2019); *Irey*, 612 F.3d at 1206.  And the district court similarly characterized Litzky's misconduct as "heinous," "disturbing," "appalling," and "horrific."  Doc. 228 at 3, 4, 14.

That was no exaggeration.  As summarized in her presentence report, Litzky took "approximately 500 images and videos of her two children, with the focus of the pictures being on the children's vaginal and buttocks areas, to send to Oquendo for his sexual gratification."  "Sometimes Litzky would initiate sending Oquendo nude pictures of the girls" to "lure Oquendo back to the house or ask for money."  She furthermore admitted to authorities "that she spread [her child's] vagina apart when taking the pictures" and would "tell" one of her children "to open her legs" while posing nude, "for Daddy."  Likewise, Litzky would "instruct" the girls "to touch themselves" and "would pose the girls" for Oquendo in "a sexually explicit manner."

Such conduct toward any child would be utterly reprehensible.  But it is made even worse by the fact that the perpetrator was

the *mother* of the victims—both of whom were less than five years old and in their formative years.  These tragic factors magnify the seriousness of the offense and the need for severe punishment.  *See Irey*, 612 F.3d at 1209 ("The less it takes to have the statutory minimum sentence imposed, the higher the sentence should be for someone who does much, much worse than the minimum amount of criminal behavior that would violate the statute.").  Indeed, the traumatic effects of Litzky's misconduct have already manifested in both young girls, and they will likely persist for some time—if not forever.  As the district court summarized, "[t]he life sentence of mental and emotional anguish and torment inflicted upon the precious children . . . cries out for extreme sanction."  Doc. 228 at 14; *see Irey*, 612 F.3d at 1207 ("[C]hildhood sexual abuse has devastating and long-lasting effects on its victims." (citing *New York v. Ferber*, 458 U.S. 747, 758 n.9 (1982)).

In addition to emphasizing the heinous nature of the offenses, the district judge took pains to avoid unwarranted sentence disparities.  *See* 18 U.S.C. § 3553(a)(6).  He compared specific sentences that he had imposed for three other mothers accused of sexually abusing their own children and explained why some of those sentences were lower or higher.  On top of that, he examined the national data for similar maternal offenders, noting that the average sentence was 339 months—quite close to Litzky's ultimate sentence, and well below many sentences we've upheld for child-pornography producers.  *See, e.g.*, *Kirby*, 938 F.3d at 1259 (1,440 months); *Sarras*, 575 F.3d at 1221 (1,200 months); *United States v.*

*Johnson*, 451 F.3d 1239, 1240–41 (11th Cir. 2006) (per curiam) (1,680 months).

Finally, the district court agreed with Litzky that her intellectual impairment and rough upbringing constituted "mitigating factors." *See* 18 U.S.C. § 3553(a)(1). But it determined that these factors weren't enough to justify Litzky's request to depart all the way down to the mandatory minimum of 15 years. Instead, the court concluded that the "gravity of the offense," coupled with Litzky's "refus[al] to express contrition or remorse for her own role in victimizing her children," justified a 30-year sentence. Doc. 228 at 17. That was not an abuse of discretion. *See, e.g., United States v. Isaac*, 987 F.3d 980, 995–96 (11th Cir. 2021) (upholding 80-year sentence in case involving sex offenses against a minor in part due to defendant's "lack of remorse"); *Hall*, 965 F.3d at 1299 (same for forty-year sentence); *Sarras*, 575 F.3d at 1220–21 (same for 100-year sentence).

All told, Litzky's 30-year sentence—a dramatic downward variance—was substantively reasonable.

★  ★  ★

We **AFFIRM**.

JORDAN, Circuit Judge, concurring:

Judge Newsom's opinion for the court correctly applies our precedent, and I therefore concur in full. I write separately to note an observation about our cases concerning psychiatric expert testimony that does not satisfy the Insanity Defense Reform Act, 18 U.S.C. § 17.

Our cases have interpreted the IDRA "to prohibit the presentation of evidence of mental disease or defect, short of insanity, to excuse conduct." *United States v. Wescott*, 83 F.3d 1354, 1358 (11th Cir. 1996). So far, so good—if expert testimony about the defendant does not satisfy the IDRA, it is inadmissible. But things are not so simple, for our cases also hold that "psychiatric evidence is still admissible where it negates the *mens rea* of a specific intent crime." *United States v. Bates*, 960 F.3d 1278, 1288 (11th Cir. 2020). As we've put it, "[e]vidence offered as 'psychiatric evidence to negate specific intent' is admissible . . . when such evidence focuses on the defendant's specific state of mind at the time of the charged offense." *United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990) (citing with approval a Seventh Circuit case which held that evidence that a defendant "suffered from a mental condition that made it highly unlikely that he would make . . . a [certain] threat" was admissible). *See also Bates*, 960 F.3d at 1288 ("[E]vidence that the defendant actually lacked *mens rea* . . . is admissible to negate the *mens rea* element of an offense."); 4 Weinstein's Federal Evidence § 704.06[1] (2d ed. 2021) ("Congress did not intend to bar all psychiatric testimony offered to negate specific

intent. . . . Indirect testimony on the mental condition of the defendant that helps the jury to reach a decision about the ultimate legal issue of whether that condition constitutes an element of the crime charged is admissible[.]'").

But that principle, it seems to me, runs headlong into Rule 704(b) of the Federal Rules of Evidence, which provides that "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." So, what seems like a prohibition on certain psychiatric evidence (the IDRA) has an exception of sorts (evidence that negates the *mens rea* of a specific intent crime), but that exception faces an evidentiary rule of exclusion (Rule 704(b)).

I'm not sure we've ever really reconciled our rulings on the IDRA, on psychiatric evidence to negate specific intent, and on Rule 704(b). Maybe the answer is that, in a case involving a specific intent crime, an expert can testify as to the "typical effect" of a condition on a "person's mental state" and allow the jury to draw (or not draw) the ultimate inference as to the defendant's intent (or lack thereof). *See, e.g., United States v. Gillis*, 938 F.3d 1181, 1194–95 (11th Cir. 2019) (stating that "an expert may, consistent with Rule 704(b), give testimony that supports an obvious inference with respect to the defendant's state of mind if that testimony does not actually state an opinion on [the] ultimate issue and instead leaves this inference for the jury to draw") (internal quotations

omitted); *United States v. Davis*, 835 F.2d 274, 276 (11th Cir. 1988) (upholding question posed to expert as to whether multiple personality disorder, in and of itself, indicates that a person is unable to understand what he is doing); *United States v. Childress*, 58 F.3d 693, 727–28 (D.C. Cir. 1995) (testimony is limited to "diagnoses, the facts upon which these diagnoses are based, and the characteristics of any mental disease or defect the expert[ ] believe[s] the defendant possessed during the relevant time period," and the expert must not opine directly or indirectly on the ultimate issue of specific intent).

But even this description is not wholly satisfactory. And that is, at least in part, because the way in which we have applied these legal principles has resulted in a nearly unworkable standard. In *Gillis*, for example, the defendant was charged with attempting to knowingly induce or entice a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b), a specific intent crime. He sought to introduce expert testimony, based on a psychosexual evaluation, that he was not interested in prepubescent children. We affirmed the exclusion of this expert's testimony as nothing more than "a thinly veiled attempt by the defense to offer an expert opinion that [the defendant] lacked the requisite intent for the [charged] offense." 938 F.3d at 1194. Although our ultimate conclusion that the district court properly excluded the expert's testimony may have made sense in that case, our analysis failed to shed light on the type of testimonial evidence that qualifies as permissible non-insanity psychiatric evidence. We explained that in a specific intent

4                    JORDAN, J., Concurring                    20-10709

case an expert can "opine on the defendant's intent" without running afoul of Rule 704(b) where the expert does not opine on the ultimate issue and leaves an "inference for the jury to draw." *Id.* But, as noted, we concluded that the proffered expert testimony "veered into the impermissible territory of offering an opinion on [the defendant's] mental state." *Id.*

So, based on our precedent, an expert cannot testify to a defendant's capacity to form mens rea. *See Bates*, 960 F.3d at 1288. And an expert also cannot testify to the defendant's mental state at the time of the crime. *See Gillis*, 938 F.3d at 1194. Or perhaps she can. *See Bates*, 960 F.3d at 1288.

I do not know how district courts are supposed to make sense of our holdings so that they can "carefully examine" proffered psychiatric evidence "to ascertain whether it would, if believed, 'support a legally acceptable theory of lack of mens rea.'" *Cameron*, 907 F.2d at 1067. Threading this needle involves "very difficult line drawing," *United States v. Santos*, 131 F.3d 16, 20 (1st Cir. 1997), as exemplified by cases such as *United States v. Bennett*, 161 F.3d 171, 183–84 (3d Cir. 1998) (affirming exclusion not only of expert testimony that the defendant was precluded by his mental disorders from forming intent to defraud but also of expert testimony that he was unlikely to act knowingly and willfully), and our cases can't possibly be of much help in the trenches. One day, in an appropriate case, we'll need to provide better guidance.