**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 22-11921

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

NIGEL RICHARDSON,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:19-cr-60129-RAR-1

————————————

Before ROSENBAUM, NEWSOM, and LUCK, Circuit Judges.

LUCK, Circuit Judge:

Nigel Richardson placed delivery orders with two restaurants so he could rob their drivers at gunpoint. For his crimes, he was charged with committing: two counts of Hobbs Act robbery; two counts of brandishing a firearm during a crime of violence; and

one count of being a felon in possession of a firearm. After a four-day jury trial, Richardson was convicted as charged.

He now appeals his convictions on four grounds. First, as to the brandishing counts, Richardson argues that Hobbs Act robbery is not categorically a crime of violence. Second, he contends that his trial on the felon-in-possession count violated the Grand Jury Clause because the grand jury didn't allege he knew about his status as a felon. Third, as to the three firearm counts, he asserts that the evidence was insufficient to show he possessed a firearm. Finally, Richardson maintains that the district court's exclusion of expert psychiatric evidence violated his right to a fair trial. After careful review, and with the benefit of oral argument, we affirm Richardson's convictions.

## FACTUAL BACKGROUND

### *The robberies*

CC Chinese Cooking—a restaurant in Pembroke Pines, Florida—received a call at around 8:30 P.M. on June 19, 2018. The caller placed a delivery order and asked that the delivery driver "have change for a hundred-dollar bill."

The driver, Michael Pearce, took the food and went to the address given by the caller—a house in nearby Miramar. Pearce testified that two men were waiting for him outside the house. Both men were black, one being "shorter," around five-foot-eight, and the other being "a little bit taller, maybe [five-foot-ten]." "The shorter one" then "pulled a gun on" Pearce and told him to give

the men everything.  The gunman, Pearce explained, pointed the gun at his "chest or above."

Pearce described the gun as "a black handgun."  He said he wasn't "familiar with guns, but it was definitely black, a smaller handgun."  There was "nothing out of the ordinary about it."  Although he couldn't tell what the gun was made of, it appeared to him to be a real gun.

Pearce "panicked" and told the two men to take whatever they wanted.  The men patted him down, took everything out of his pockets, took the food, and then ran off.

About a week later, at around 10:30 P.M. on June 25, a Miramar Domino's Pizza received a delivery order over the phone.  The caller's phone number and delivery address were the same as those used for the order placed with CC Chinese on June 19.

The Domino's delivery driver, Even Madero, testified that two men were waiting for him when he parked his car in front of the house.  He described one of the men as "not that tall, and his head was covered up with some clothing."  The other man was "[t]aller."  Madero got out of the car with the four boxes of pizza that they ordered.

Madero explained that when he approached the two men, "[t]he shorter one" pointed a gun at Madero's chest.  The gun was black and "not that big."  Madero said the gun "was made of iron or steel or whatever material they make it from."  To him, the gun appeared real.

The gunman demanded Madero hand over his wallet, his phone, and the pizzas, and Madero complied.  Later that night, at 11:16 P.M., surveillance footage captured Richardson in a hallway at his apartment complex.  He was carrying four boxes of Domino's pizza.

*The investigation*

Miramar officers learned that the phone number used to call CC Chinese and Domino's "was assigned to a texting app called TextNow."  TextNow informed the officers that the caller's username was "Trinidad Tiger" and that his email was "gunman-laflare@yahoo.com."  With the information from TextNow, the officers Google-searched the email address and found a Facebook account for "Trinidad Tiger."

Officers ran Trinidad Tiger's Facebook pictures through a facial recognition software, which matched the photos to Richardson.  After the match, officers prepared photo lineups to show Pearce and Madero.  The lineups included pictures of Richardson and five other men.  Pearce didn't select any photo as showing the gunman.  But Madero identified Richardson as the gunman; he wrote next to Richardson's photo, "I recognized this person that pointed me with a gun."  The officers then obtained a warrant to arrest Richardson at his apartment complex.

After the arrest, Detectives Joe Tomlin and Jonathan Zeller interviewed Richardson about the robberies.  Richardson denied any involvement.  He told the detectives that he lived with his grandmother in North Miami, and he repeatedly told them that he

was at her house on June 19 and 25.  Richardson also told the detectives that the last time he held a gun was when he visited "Big Al's" gun range "like a month" before.  He explained that he didn't bring his own gun but instead used one that his friend rented.  When asked about his cell phone—an LG phone—Richardson told the detectives that he "just got it."

Following the interview, the government obtained a warrant to search Richardson's phone, and Detective Zeller analyzed it.  He found that TextNow was installed on the phone.  He also found "photographs and videos of [Richardson] holding a firearm."

Two of the photos showed Richardson shirtless in his apartment wearing blue underwear or shorts, black pants, and with a red bandana.  These photos also showed a black handgun holstered in Richardson's pants.  For these two photos, Detective Zeller was able to recover metadata from the phone.  The data revealed that these two photos had capture times of June 17, 2018, at 5:07 A.M. and 5:08 A.M.

The capture time, Detective Zeller explained, indicates the date and time that someone took the picture on the phone.  He acknowledged that it might be theoretically possible for the capture time not to reflect the true creation date if someone used their phone to take "a picture of the picture."  But he also testified that the data for the two June 17 photos didn't show they were screenshotted or transferred over from another phone.

A similar photo showed Richardson shirtless, wearing blue underwear or shorts, black pants, and with the same hairstyle, but

outside and without a gun holstered.  The metadata showed that the picture was originally taken using an iPhone and had a capture time of March 30, 2018, at 11:24 A.M.  It also listed a "[m]odified" date of June 15, 2018.  Detective Zeller explained that the modified entry showed this picture was taken on March 30 with the iPhone but transferred over to Richardson's newer LG phone on June 15.

Three other photos recovered from the LG phone showed Richardson holding a black handgun.  One of these photos showed that the gun had an orange, safety-off indicator dot above and behind the trigger.  Detective Zeller was unable to recover metadata for these photos.  Also, four videos showed Richardson with a black handgun.  Detective Zeller was unable to recover metadata for them.

Law enforcement forwarded the photos to Hi-Point Firearms, an Ohio gun manufacturer, to ask whether the gun pictured with Richardson was a Hi-Point gun.  Hi-Point president Joseph Strassell, who described himself as "[i]ntimately" familiar with Hi-Point's firearms and their parts, reviewed the photos.  Strassell verified that the photos of Richardson showed him carrying a Hi-Point handgun—specifically, Hi-Point's model C9.  The C9 is a black handgun that expels a projectile through explosive action.

Strassell explained at trial that Hi-Point "work[s] very closely with law enforcement [to] mak[e its] firearms uniquely identifiable."  He pointed out that a C9 is marked "'Hi-Point Firearms' on the slide" and "has a triangular logo up near the front of the slide."  But, he explained, those aren't the only unique features.  A C9 also

has "a large, heavy slide to absorb the recoil . . . .  It's not square and small."  The C9 has "some scallop serrations" on the back "that are unique to [Hi-Point] firearms."  The same is true as to the size and rounded shape of the C9's magazine shoe.  Lastly, the C9's safety-off indicator's location is unique.

Strassell then testified that the pictures of Richardson showed him with a handgun that has all of the C9's unique features.  In one of the June 17 photos, Strassell showed how the gun had the C9's unique serrations and magazine shoe.  He said that "the overall shape of the pistol [wa]s very familiar" and "look[ed] like a Hi-Point C9."  The handgun pictured in Richardson's other photos, he continued, also had the C9's unique features, including the serrations, the large slide, the magazine shoe's shape, and the orange active-firing indicator's location.

Hi-Point has never approved any replicas, airsoft guns, or BB guns that look like the C9.  Although Hi-Point's attorneys "actively search[] for any infringement," they have never found any unapproved replicas on the market.

## PROCEDURAL HISTORY

A grand jury indicted Richardson on five counts.  Count one alleged that Richardson committed Hobbs Act robbery as to Pearce, in violation of 18 U.S.C. section 1951(a).  Count two alleged that Richardson brandished a firearm in furtherance of a crime of violence, in violation of section 924(c)(1)(A).  The indictment identified the crime of violence as the Pearce Hobbs Act robbery.

Counts three and four mirrored counts one and two, but they were related to the Madero robbery.

Count five alleged that, "[o]n or about June 19, 2018," Richardson "possessed a firearm in and affecting interstate and foreign commerce, having previously been convicted of a crime punishable by imprisonment for a term exceeding one year, and did so knowingly, in violation of [s]ection 922(g)(1)." The case proceeded to trial.

*Competency to stand trial and psychiatric evidence*

But before the trial began, a number of psychologists assessed whether Richardson was competent to stand trial. One of them was Dr. Evan Du Bois. Dr. Du Bois evaluated Richardson in 2020 and prepared a report with his opinion that, although Richardson had a mental health condition, he was competent to proceed. Dr. Du Bois reported that Richardson told him, "Oh I've taken plea deals in the past so I guess that made me guilty."

The district court held a competency hearing, and Dr. Du Bois testified. When Dr. Du Bois was asked if Richardson discussed his defense strategy, Dr. Du Bois answered, "Somewhat. . . . But from my recollection he had kind of a limited understanding of what even happened. And part of that, I think, stemmed from perhaps mental illness at the time." Dr. Du Bois also testified that Richardson had discussed his earlier attempted robbery conviction "to some degree" and had spoken about having previous convictions or "taking plea deals in the past." Based on

Dr. Du Bois's report and testimony, the district court found that Richardson was competent to stand trial.

After Richardson was found competent, the government moved to exclude any evidence that "Richardson suffered from a mental condition or diminished capacity that negate[d] the intent element of the charged offenses, or improperly invoke[d] sympathy." While psychiatric evidence can be used to support an insanity defense, the government contended, Richardson did not intend to raise insanity. Psychiatric evidence, the government argued, could not be used to negate Richardson's mens rea because the indictment only alleged general intent crimes, not specific intent crimes. Richardson responded that Dr. Du Bois's evaluation was admissible to "rebut [section 922(g)(1)'s] element . . . of knowledge of prohibited status," which the government must prove after *Rehaif v. United States*, 588 U.S. 225 (2019).

The district court granted the government's motion. The competency evidence, it found, would create "a massive [Federal Rule of Evidence] 403 concern." The district court explained that diminished capacity defenses do not apply to general intent crimes, and the evidence would be misleading because a "snapshot" of Richardson's mental health at a particular time would not necessarily reflect "his mental state throughout not only the commission of this offense but prior to that." The district court also concluded that *Rehaif* "doesn't change the calculus . . . for letting in diminished capacity evidence."

During the trial, Richardson moved to introduce a stipulation about Dr. Du Bois's evaluation and competency-hearing testimony:

> A doctor at the Federal Bureau of Prisons, who has previously been accepted as an expert in mental health by the parties in this case and the Court, performed an evaluation on the defendant to determine his mental health status.
>
> Based upon the findings, the expert determined that the defendant has a mental health history, to include involuntary hospitalization and forced medications since approximately 2015.
>
> Based upon that evaluation, the doctor testified under oath and was questioned by the parties in this case. The doctor testified that the defendant has a limited understanding of the events that happened partially stemming from his mental illness at the time.
>
> Further, the doctor testified, upon questioning by the Government, that the defendant's mental illness had an effect on his ability to make rational and informed decisions without his medication.
>
> Finally, the doctor testified that the defendant only had some degree of memory about a prior criminal history and may have incorrectly stated he had accepted plea deals, plural, in the past.

The government objected, and the district court sustained the objection for the same reasons it granted the government's motion to exclude Dr. Du Bois's report and testimony.

*Richardson's motion to dismiss and for judgment of acquittal*

Also during trial, Richardson moved to "hold . . . [s]ection 922(g) unconstitutionally vague after the *Rehaif* ruling as it applies to this case," and to dismiss the felon-in-possession count, "which charges a violation of [section] 922(g) but not a violation of [section] 924(a)(2)." The district court denied the motion, finding there was no basis to dismiss the felon-in-possession count "as unconstitutional or void for vagueness."

Then, after the government rested, Richardson moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. First, as to the firearm counts, Richardson argued that, although the government "attempted to prove that the firearm in the photographs was a real firearm manufactured by Hi-Point," it failed to prove that gun was "the same alleged firearm used" in the robberies. Specifically, as to the felon-in-possession count, Richardson asserted that although "it's alleged that [he] possessed the firearm on June 19th," there was no proof that the firearm in the photos was the same as the "alleged firearm used on June 19th."

Second, Richardson argued that the government failed to prove he knew about his felon status, citing his mental health condition. And third, Richardson maintained that the district court should dismiss the felon-in-possession count because it "doesn't allege a federal action here because it doesn't charge any violation of

[section 924](a)(2)," and "never alleges or accuses [Richardson] of not knowing that he was a prohibited person, as required in *Rehaif*."

The district court denied the rule 29 motion. The district court concluded that a reasonable jury could find Richardson committed each offense. As for Richardson's challenge to the felon-in-possession count, the district court relied on *United States v. Leonard*, 4 F.4th 1134 (11th Cir. 2021), as involving an "almost identical" indictment that "was found sufficient."

Richardson rested without presenting a case and renewed his rule 29 motion. The district court denied that motion too.

### *Verdict and sentence*

The jury found Richardson guilty as charged. The jury found Richardson guilty of Hobbs Act robbery against both Pearce and Madero. On the brandishing counts, the jury found that Richardson brandished, used, carried, and possessed a firearm. It also found that he performed those acts during, in relation to, and in furtherance of the Pearce and Madero Hobbs Act robberies. And on the felon-in-possession count, the jury found that Richardson knowingly possessed a firearm as a convicted felon.

After the district court imposed a 192-month prison sentence, Richardson appealed his convictions.

## DISCUSSION

We divide our analysis in four parts. First, we conclude that Richardson's Hobbs Act robbery convictions are valid predicate

crimes of violence for his brandishing convictions. Second, as to the felon-in-possession count, we address why Richardson hasn't shown a Grand Jury Clause violation. Third, we explain that a reasonable jury could find Richardson brandished a firearm during his Hobbs Act robberies and knowingly possessed a firearm as a convicted felon. And fourth, we decide that the district court's exclusion of Dr. Du Bois's evaluation, testimony, and the proposed stipulation didn't deny Richardson a fair trial.

*Hobbs Act robbery as a crime of violence*

Richardson first argues that we must vacate his convictions for brandishing a firearm in furtherance of a crime of violence because the district court lacked jurisdiction as to those charges. He maintains that the only predicate offenses alleged in those counts—Hobbs Act robberies—do not qualify as crimes of violence under section 924(c)(3)(A)'s elements clause. Thus, he contends, the indictment didn't charge an "offense against the United States" under 18 U.S.C. section 3231. We conclude that the district court had jurisdiction as to the section 924(c) counts because Hobbs Act robbery is a crime of violence.[1]

Section 924(c) makes it unlawful for any person to brandish a firearm "in furtherance of" "any crime of violence." 18 U.S.C. § 924(c)(1)(A). A "crime of violence" is a term of art that means

---

[1] We review de novo whether an offense qualifies as a crime of violence under the elements clause. *Alvarado-Linares v. United States*, 44 F.4th 1334, 1341 (11th Cir. 2022).

any felony offense that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." *Id.* § 924(c)(3)(A).  This definition is known as the elements or use-of-force clause.[2] *Brown v. United States*, 942 F.3d 1069, 1071 (11th Cir. 2019).  To determine whether an offense is a crime of violence, "[t]he only relevant question is whether [it] always requires the government to prove—beyond a reasonable doubt, as an element of its case—the use, attempted use, or threatened use of force." *United States v. Taylor*, 596 U.S. 845, 850 (2022).

Here, the jury found Richardson guilty of brandishing a firearm in furtherance of two Hobbs Act robberies.  A Hobbs Act robbery is:  (1) "the unlawful taking or obtaining of personal property"; (2) "from the person or in the presence of another, against his will"; (3) "by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property."  18 U.S.C. § 1951(b)(1).  So, the question is whether—to convict a person of Hobbs Act robbery—the government must prove, beyond a reasonable doubt, that the person used, attempted to use, or threatened to use physical force as required by section 924(c).

We answered that question in *In re Saint Fleur*, 824 F.3d 1337 (11th Cir. 2016).  There, we held that a "conviction for Hobbs Act robbery . . . clearly qualifies as a 'crime of violence' under the use-of-force clause in [section] 924(c)(3)(A)" because "the elements

---

[2] The other part of the definition, section 924(c)(3)(B)'s residual clause, is unconstitutionally vague.  *See United States v. Davis*, 588 U.S. 445, 448 (2019).

of . . . [section] 1951 robbery . . . require the use, attempted use, or threatened use of physical force 'against the person or property of another.'" *Id.* at 1340–41 (quoting 18 U.S.C. § 924(c)(3)(A)). *Saint Fleur* directly connected the Hobbs Act robbery elements, "as replicated in the indictment," to the definition of a crime of violence. *Id.* at 1341. Twice after *Saint Fleur* we reaffirmed that Hobbs Act robbery was a crime of violence. *See In re Colon*, 826 F.3d 1301, 1305 (11th Cir. 2016) (holding that aiding and abetting Hobbs Act robbery is a crime of violence); *United States v. St. Hubert*, 909 F.3d 335, 345–46 (11th Cir. 2018) (holding that Hobbs Act robbery is a crime of violence under our binding precedent in *Saint Fleur* and *Colon*).

Richardson, as he must, acknowledges these decisions. But, he argues, our holdings that Hobbs Act robbery is a crime of violence under the elements clause did not survive the Supreme Court's decision in *Taylor*. We considered—and rejected—the same argument in *United States v. Solomon*, 136 F.4th 1310 (11th Cir. 2025). There, we explained that "our cases—both before and after *Taylor*—say that Hobbs Act robbery cannot be accomplished without the use, attempted use, or threatened use of force." *Id.* at 1321. To reach that conclusion, we relied on *United States v. Wiley*, 78 F.4th 1355 (11th Cir. 2023), which explained that the Supreme Court's analysis in *Taylor* was limited to attempted Hobbs Act robbery. *Solomon*, 136 F.4th at 1319–20; *see Wiley*, 78 F.4th at 1363–65. Thus, the *Wiley* court said, aiding and abetting a Hobbs Act robbery was a crime of violence "because *Taylor* did not disturb our holding that completed Hobbs Act robbery is a crime of violence." *Wiley*, 78 F.4th at 1365. Following *Wiley*, *Solomon* reaffirmed that

our earlier holding—that a completed Hobbs Act robbery was categorically a crime of violence under the elements clause—was still good law post-*Taylor*. *Solomon*, 136 F.4th at 1321. Indeed, in a supplemental authority letter, Richardson concedes that *Solomon* "rejected the same challenge" he raises here. We agree that it did.

*Felon-in-possession charge and the Grand Jury Clause*

Richardson's second argument on appeal is that the felon-in-possession count did not cite section 924(a)(2) or allege he knew about his status as a felon when he possessed the gun. Thus, he contends, we "cannot be assured from the face of the indictment that the grand jury found *Rehaif*'s knowledge-of-status element, as the Fifth Amendment [Grand Jury C]lause requires."[3]

The Grand Jury Clause "confer[s] a right not to be tried" for an offense "when there is no grand jury indictment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 802 (1989). "A grand jury can perform its function of determining probable cause and returning a true bill only if all elements of the offense are contained in the indictment." *United States v. Outler*, 659 F.2d 1306, 1310 (5th Cir. Unit B Oct. 1981)[4] (citations omitted) ("There is no question that a

---

[3] We review de novo challenges to an indictment, *see United States v. Johnson*, 981 F.3d 1171, 1178 (11th Cir. 2020) (citations omitted), including those arising under the Grand Jury Clause, *see United States v. McIntosh*, 704 F.3d 894, 900, 903–05 (11th Cir. 2013).

[4] We adopted as binding precedent all Fifth Circuit Unit B decisions issued on any date. *See Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

grand jury indictment must set forth each essential element of an offense in order for a resulting conviction to stand.").

In determining whether an indictment contains each element of an offense, we give it "a common sense construction." *Leonard*, 4 F.4th at 1143 (quoting *United States v. Jordan*, 582 F.3d 1239, 1245 (11th Cir. 2009)). We do not ask if the indictment "could have been drafted with more clarity." *Id.* Instead, it is usually enough that the indictment tracks the relevant statutory language. *See Jordan*, 582 F.3d at 1246.

Here, the indictment tracked the language of sections 922(g)(1) and 924(a)(2). It alleged that: (1) Richardson "possessed a firearm"; (2) his possession was "in and affect[ed] interstate and foreign commerce"; and (3) he had "previously been convicted of a crime punishable by imprisonment for a term exceeding one year." [**DE 1 at 4**] *Cf.* 18 U.S.C. § 922(g)(1) ("It shall be unlawful for any person . . . who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year . . . [to] possess in or affecting commerce[] any firearm or ammunition . . . .").

Then, after alleging Richardson possessed the gun as a felon, the indictment alleged that he "did so knowingly." *Cf. id.* § 924(a)(2) (2018) ("Whoever knowingly violates [section 922(g)(1)] shall be fined . . . , imprisoned not more than [ten] years, or both."), *amended by*, Bipartisan Safer Communities Act, Pub. L. No. 117-159, § 12004(c), 136 Stat. 1313, 1329 (2022). "Reasonably read," the phrase "did so knowingly" applies to each material element spelled

out before it—including Richardson's felon status.  *See Leonard*, 4 F.4th at 1143.

"Knowingly" modifies the transitive verb "did," and that verb's direct object ("so") naturally refers back to all that preceded it: "possessed a firearm . . . , having previously been convicted of a crime punishable by imprisonment for a term exceeding one year." Thus, an ordinary reader would understand that "knowingly" modifies how Richardson "performed the entire action." *See Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009) ("In ordinary English, where a transitive verb has an object, listeners in most contexts assume that an adverb (such as knowingly) that modifies the transitive verb tells the listener how the subject performed the entire action, including the object as set forth in the sentence."). The alternative reading, limiting "did so knowingly" to "possessed" and nothing more, is precisely the type of strained construction of an indictment that we've repeatedly cautioned against. *See, e.g.*, *Leonard*, 4 F.4th at 1143 (explaining that we "give [an indictment] a common sense construction" (quoting *Jordan*, 582 F.3d at 1245)).

Giving the indictment a common sense construction, it shows that the grand jury found probable cause that Richardson "knew both that he engaged in the relevant conduct (that he possessed a firearm) and also that he fell within the relevant status (that he was a felon[)]." *See Rehaif*, 588 U.S. at 227.  For that reason, there was no Grand Jury Clause violation.

Richardson makes two arguments to the contrary. First, he contends that the indictment here mirrors the one we held was fatally deficient in *United States v. Martinez*, 800 F.3d 1293 (11th Cir. 2015). Second, he argues that, under *Stirone v. United States*, 361 U.S. 212 (1960), and *Russell v. United States*, 369 U.S. 749 (1962), the grand jury's failure to charge knowledge of status is structural error that "mandate[s] automatic vacatur." Neither of these arguments supports vacating Richardson's felon-in-possession conviction.

First, Richardson's indictment doesn't suffer the same flaw as the *Martinez* indictment. The *Martinez* indictment charged a violation of 18 U.S.C. section 875(c) for knowingly transmitting a threatening communication. *See* 800 F.3d at 1294. Although the Supreme Court had held that proving a section 875(c) violation required showing more than that the defendant knowingly sent a communication, *see Elonis v. United States*, 575 U.S. 723, 737–39 (2015) (concluding section 875(c)'s "mental state requirement must [also] apply to the fact that the communication contains a threat"), the *Martinez* indictment alleged only that the defendant knowingly sent an email, without alleging that the defendant knew the email "contained a threat," 800 F.3d at 1294. Here, on the other hand, Richardson's indictment alleged that he knew he was a felon. The phrase "did so knowingly" modified the felon-status portion of the indictment.

Second, Richardson's reliance on *Stirone* and *Russell*—and his call for structural error—assumes that there was an error. But, as we've explained, there was no Grand Jury Clause violation here.

So, even if Richardson was right that *Stirone* and *Russell* require "automatic vacatur" where an indictment did not allege knowledge of felon status—we're not saying that he is—they plainly don't require automatic vacatur of Richardson's felon-in-possession conviction because his indictment did allege he knew his felon status.

*Sufficiency of the evidence on the firearm counts*

Although the jury found Richardson guilty on the five counts alleged in the indictment, he challenges the sufficiency of evidence only as to the firearm counts. Richardson contends that the government's evidence fell short "on the crucial 'firearm' element" of his brandishing and felon-in-possession convictions. Pointing to how no firearm was ever recovered, he contends the government failed to prove that he possessed a "firearm" as defined in 18 U.S.C. section 921(a)(3).[5]

We review de novo whether sufficient evidence supported a conviction, *United States v. Charles*, 313 F.3d 1278, 1284 (11th Cir. 2002), drawing all reasonable inferences in the government's favor, *United States v. Friske*, 640 F.3d 1288, 1290–91 (11th Cir. 2011). "The evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among

---

[5] A "firearm," as used in the brandishing and felon-in-possession statutes, is "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." 18 U.S.C. § 921(a)(3).

the reasonable conclusions to be drawn from the evidence presented at trial." *Id.* (quoting *United States v. Poole*, 878 F.2d 1389, 1391 (11th Cir. 1989)).

We first review the evidence supporting Richardson's conviction for possessing a firearm as a convicted felon. Then, we consider his convictions for brandishing a firearm in furtherance of a crime of violence.

### Felon-in-possession count

A reasonable jury could conclude Richardson possessed a Hi-Point C9, which is a "firearm" as defined in 18 U.S.C. section 921(a)(3). Detective Zeller extracted five photos and four videos from Richardson's LG cell phone showing that he flashed a black handgun. Strassell testified that the gun in the photos was a C9. He explained that the C9 has many unique features that distinguish it from other handguns on the market, including its scalloped serrations, the magazine shoe's shape and size, the active indicator's location, and the Hi-Point logo. Strassell then showed how Richardson's gun had the C9's unique features, confirming that the gun pictured was a C9. He also explained that Hi-Point hasn't approved any replicas, including airsoft guns, and the company is not aware of any infringing products on the market.

That wasn't enough, Richardson contends, because the government had to show that he possessed the C9 as a felon during the June 19 robbery. Or, in his words, "viewing the metadata . . . in the light most favorable to [the government] (*i.e.*, that [a] photo was taken on June 17th)" doesn't establish that the C9 "was used in a

robbery two days later." Citing how he wore the same clothes and hairstyle in a photo with a March 30 capture date, Richardson argues that the June 17 photos could've been pictures of pictures taken earlier with another phone.

The premise of Richardson's contention is that the government had to show he possessed the firearm as charged on June 19—but this is wrong. We've held that "it suffices if a date reasonably near [the on-or-about designation] is established" at trial. *See United States v. Grapp*, 653 F.2d 189, 195 (5th Cir. Unit A Aug. 1981) (concluding no variance existed where the indictment alleged May 27, 1977, but the trial evidence reflected "the middle of 1977"); *see also, e.g., Russell v. United States*, 429 F.2d 237, 238 (5th Cir. 1970) ("It seems well settled that an allegation as to the time of the offense is not an essential element of the offense charged in the indictment . . . ."); *Winslett v. United States*, 124 F.2d 302, 303 (5th Cir. 1941) ("It has been held too often . . . that the date of an alleged offense as stated in the indictment is not binding so as to limit the proof to that specific date . . . .").

The metadata for two of the photos from Richardson's phone was sufficient evidence that he possessed a C9 within a reasonable time—two days—of the indictment's June 19 allegation. The metadata showed a capture time of June 17, 2018 after 5:00 A.M. The capture time, Detective Zeller testified, reflects the date that someone took the picture on that phone. The jury was free to credit that testimony, especially considering Detective Zeller's additional testimony that there was no indication that the

June 17 photos were screenshots, were transferred over from another phone, or were pictures of other pictures. Plus, the March 30 photo's metadata listed a modified date of June 15. The metadata for the two June 17 photos, in contrast, didn't mention any modified or download date, which showed that Richardson posed for them on June 17.

### Brandishing counts

Next, we consider whether there was sufficient evidence that Richardson brandished a firearm in furtherance of the Hobbs Act robberies. 18 U.S.C. § 924(c). We have held that "lay opinion is sufficient to establish that a device is a firearm." *United States v. Hunt*, 187 F.3d 1269, 1270 (11th Cir. 1999). That's true even when, as here, no firearm is introduced at trial. *See id.* at 1270–71; *United States v. Woodruff*, 296 F.3d 1041, 1049 (11th Cir. 2002); *United States v. King*, 751 F.3d 1268, 1274–75 (11th Cir. 2014).

Here, the delivery drivers testified that Richardson robbed them with a black handgun "at close range"—specifically, pointing it at their chest or higher. *Hunt*, 187 F.3d at 1271; *cf. King*, 751 F.3d at 1274 (noting how the "weapon [was] thrust directly in [the witnesses'] faces"). The drivers testified that they believed the weapons pointed at them were real guns.

Pearce, for example, explained that there was "nothing out of the ordinary about" the gun pointed at him. And Madero testified that he "would swear that it was made of iron or steel or whatever material they make it from." This testimony creates "a reasonable inference that the object in [Richardson]'s hand was a real

gun and not a toy." *See Hunt*, 187 F.3d at 1271; *see also United States v. Beverly*, 99 F.3d 570, 572–73 (3d Cir. 1996) (affirming a section 924(c) conviction, although "the only evidence presented with respect to the firearms charge was the testimony of [a lay witness] that [the defendant] threatened him with a gun"); *United States v. Taylor*, 54 F.3d 967, 975–76 (1st Cir. 1995) (same, relying on three eyewitnesses' testimony); *United States v. Lankford*, 196 F.3d 563, 567–68, 575–76 (5th Cir. 1999) (same, relying solely on one eyewitness's testimony); *United States v. Lawson*, 810 F.3d 1032, 1039–40 (7th Cir. 2016) (same, although "the only evidence that there was a 'firearm'" was one eyewitness's testimony).

In addition, the C9 matched the drivers' descriptions of the gun pointed at them.  Because Richardson was pictured carrying the C9 two days before the first robbery, a reasonable jury could find he used the same C9 during the robberies instead of a toy replica.

In response, Richardson argues that neither Pearce nor Madero could conclusively identify the gun from the robberies as a real gun.  The drivers testified, Richardson contends, that they were not familiar with guns and that Richardson's gun only "appeared" or "looked" real.  And Pearce was shown pictures of seven black handguns on cross-examination, including one airsoft, but he couldn't identify which ones were real.

But Richardson's arguments miss the mark.  The drivers didn't have to testify "to a scientific certainty" that Richardson's gun could have fired a projectile through explosive action.  *Hunt*,

187 F.3d at 1271. It was enough that the drivers testified Richardson's gun appeared real and that they reacted as if it wasn't a toy. *See United States v. De Leon-Quinones*, 588 F.3d 748, 752 (1st Cir. 2009) (reasoning that evidence showing "the [victims] reacted as if the gun was real, following [the defendant]'s various orders," supported the firearm element); *Parker v. United States*, 801 F.2d 1382, 1384 (D.C. Cir. 1986) ("The act of threatening others with a gun is tantamount to saying that the gun is loaded and that the gun wielder will shoot unless his commands are obeyed." (quotation omitted)).

Despite Richardson's insistence that lay testimony can't establish a fact if the witness qualifies his perception of it by saying something "*appeared*" or "*looked*" real, we and other circuits have accepted such testimony as proof the underlying fact existed. *See United States v. Seastrunk*, 580 F.2d 800, 801–02 (5th Cir. 1978) (affirming 18 U.S.C. section 2113(d) conviction for robbery with a dangerous weapon, reasoning victim's testimony that the defendant displayed what "*looked to [her]* like a gun butt of an automatic weapon, dark in color" allowed an inference that the defendant used a gun (emphasis added)).[6] Indeed, the drivers' testimony that

---

[6] *See also United States v. Buggs*, 904 F.2d 1070, 1075–76 (7th Cir. 1990) (officers' lay testimony that "they had seen what '*appeared* to them to be a large pistol[, i]t *appeared* to each of them to be a .357 magnum but neither was sure,'" supported section 924(c) conviction (emphasis in original)); *Lawson*, 810 F.3d at 1039–40 (eyewitness testimony that "the gun looked like a Cobra .380" supported section 924(c) conviction although the witness "admitted that [the gun] 'could have been' a well-made replica").

the gun "appeared" real was the sort of competent lay opinion testimony the federal rules of evidence contemplate. *See Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1196–98 (3d Cir. 1995) (explaining that "prototypical" lay testimony "relates to the appearance of persons or things," such that courts have allowed lay testimony to establish, for example, a person's drunkenness or speeding in a car).

### Psychiatric evidence

Richardson's final contention on appeal is that the district court violated his right to a fair trial by excluding Dr. Du Bois's evaluation and competency-hearing testimony, and the proposed stipulation. He argues that this evidence showed his mental condition causes a "lack of memory," meaning he might've forgotten about his felon status when he possessed the C9. We conclude the district court's exclusion of the evidence didn't violate his right to a fair trial.[7]

Embodied in the right to due process "is the idea that criminal defendants must be afforded the opportunity to present evidence in their favor." *United States v. Hurn*, 368 F.3d 1359, 1362 (11th Cir. 2004). A defendant's "right to a fair trial is violated" if excluded evidence "is material in the sense of a crucial, critical,

---

[7] "Whether the exclusion of evidence violated a constitutional guarantee is a legal question reviewed de novo." *United States v. Litzky*, 18 F.4th 1296, 1302 n.2 (11th Cir. 2021) (quoting *United States v. Sarras*, 575 F.3d 1191, 1209 n.24 (11th Cir. 2009)).

highly significant factor." *United States v. Ramos*, 933 F.2d 968, 974 (11th Cir. 1991).

When a defendant argues that the exclusion of evidence denied him due process, we apply a two-step framework. First, we ask whether "th[e] right was actually violated." *Hurn*, 368 F.3d at 1362. If yes, we consider "whether th[e] error was 'harmless beyond a reasonable doubt.'" *Id.* at 1362–63 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

Richardson's argument fails at both steps. At step one, Richardson did not have the right to present Dr. Du Bois's findings. In *Clark v. Arizona*, 548 U.S. 735 (2006), the Supreme Court upheld a state rule that categorically excluded evidence "about a defendant's mental incapacity owing to mental disease or defect" unless he pleaded an insanity defense. *Id.* at 756–57, 776. The Court explained that the "rule serves to preserve the [s]tate's chosen standard for recognizing insanity as a defense and to avoid confusing and misunderstanding on the part of jurors." *Id.* at 779. That's because "allowing mental-disease evidence on *mens rea* can . . . easily mislead" a jury. *Id.* at 776.

We applied this same reasoning to the Insanity Defense Reform Act in *United States v. Litzky*, 18 F.4th 1296 (11th Cir. 2021). Absent raising an insanity defense, the Act makes psychiatric evidence inadmissible "to excuse conduct." *Id.* at 1303 (quoting *United States v. Westcott*, 83 F.3d 1354, 1358 (11th Cir. 1996)). Although the defendant in *Litzky* disavowed any insanity defense, she attempted to present psychiatric evidence to negate the mens rea of

a specific intent crime. *Id.* We held that excluding the proffered psychiatric evidence was not a due process violation because the report did not focus on the defendant's state of mind during the alleged crimes. *Id.* The psychiatric evidence, we found, "would only confuse the jury and distract from the relevant issues." *Id.* at 1305.

Here, like the report in *Litzky*, nothing about Dr. Du Bois's findings spoke to Richardson's knowledge at the time he possessed the C9. Dr. Du Bois evaluated Richardson's competency in 2020, but the robberies occurred two years earlier, in June 2018. Dr. Du Bois didn't evaluate Richardson to determine if he remembered his 2013 conviction during the 2018 robberies. Dr. Du Bois evaluated whether Richardson's condition—in 2020—rendered him "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241; *cf. Litzky*, 18 F.4th at 1305 ("[W]hether [the defendant] knew what she was doing [at the time of the offense,] not whether, as a general matter, she had mental health issues . . . [,] was the relevant question."). For that reason, admitting Dr. Du Bois's report and testimony "would only confuse the jury and distract from the relevant issues." *See Litzky*, 18 F.4th at 1305.

In addition, the felon-in-possession charge is a general-intent offense. *United States v. Vereen*, 920 F.3d 1300, 1308 (11th Cir. 2019); *United States v. Moore*, 76 F.4th 1355, 1362 (11th Cir. 2023) (citing *Vereen*, 920 F.3d at 1308). "In the vast majority of cases, psychiatric

evidence is inadmissible to negate *mens rea* in general-intent prosecutions." *United States v. Bates*, 960 F.3d 1278, 1288 (11th Cir. 2020).

Richardson contends that *United States v. Russell*, 957 F.3d 1249 (11th Cir. 2020), controls our step-one analysis, but it doesn't. *Russell* vacated a felon-in-possession conviction—appealed while *Rehaif* was pending—because "[t]he jury was never given the opportunity to decide whether [the defendant] knew [about his prohibited status]." *Id.* at 1254. The district court had excluded any evidence about the defendant's subjective state of mind because the felon-in-possession statute required applying "an 'objective standard.'" *Id.* at 1253.

Here, unlike in *Russell*, the district court explained to the jury that Richardson's knowledge of his felon status was an element of the felon-in-possession charge. And the district court did not exclude all evidence bearing on Richardson's knowledge of his felon status in 2018. The district court only excluded the report and testimony from Dr. Du Bois about Richardson's mental state in 2020.

In any event, at step two, any error in excluding Dr. Du Bois's findings was harmless beyond a reasonable doubt. *See Hurn*, 368 F.3d at 1362–63. The content of Dr. Du Bois's evaluation was inculpatory rather than exculpatory. Both his report and testimony mentioned that Richardson remembered his prior conviction despite his mental condition because he mentioned that he had taken plea deals in the past. There was also evidence Richardson served thirty-three months in prison for his 2013 conviction,

and we've said that fact isn't easily forgotten.  *Cf. United States v. Roosevelt Coats*, 8 F.4th 1228, 1238 (11th Cir. 2021) (concluding that a felon generally knows he is a felon because a felony "is simply not the kind of thing that one forgets" (quotation omitted)).

## CONCLUSION

Hobbs Act robbery is a crime of violence.  Richardson hasn't shown any Grand Jury Clause violation as to the felon-in-possession count because the indictment alleged that he knew about his prohibited status.  The government's evidence—the drivers' testimony and photos of Richardson with his C9 before the robberies—was sufficient to show Richardson possessed and brandished a firearm.  And the district court did not deny Richardson a fair trial by excluding the expert psychiatric evidence.  For these reasons, we affirm his convictions.

**AFFIRMED.**